# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-4318

PATTY CARRADINE,

*Plaintiff-Appellant,*

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:02-CV-122—**Roger B. Cosbey**, *Magistrate Judge.*

———————

ARGUED JUNE 11, 2003—DECIDED MARCH 12, 2004

———————

Before POSNER, COFFEY, and RIPPLE, *Circuit Judges.*

POSNER, *Circuit Judge.* Applicants for social security benefits who claim to be disabled from working because of extreme pain make the job of a social security administrative law judge a difficult one. Medical science confirms that pain can be severe and disabling even in the absence of "objective" medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant. E.g., Dennis C. Turk & Akiko Okifuji, "Assessment of Patients' Reporting of

Pain: An Integrated Perspective," 353 *Lancet* 1784 (1999); Paula M. Trief *et al.*, "Functional *vs.* Organic Pain: A Meaningful Distinction?" 43 *J. Clinical Psych.* 219 (1987). And so "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (per curiam) (citations omitted). "Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition. To insist in such a case, as the social security disability law does not . . . that the subjective complaint, even if believed by the trier of fact, is insufficient to warrant an award of benefits would place a whole class of disabled people outside the protection of that law." *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996) (citations omitted); see 20 C.F.R. § 404.1529(b)(2).

But of course this dispensation invites the unscrupulous applicant to exaggerate his or her pain without fear of being contradicted by medical evidence. The administrative law judge must be alert to this possibility and evaluate the applicant's credibility with great care. His responsibility is all the greater because determinations of credibility are fraught with uncertainty, e.g., Judy Zaparniuk, John C. Yuille & Steven Taylor, "Assessing the Credibility of True and False Statements," 18 *Int'l J.L. & Psychiatry* 343 (1995); Michael W. Mullane, "The Truthsayer and the Court: Expert Testimony on Credibility," 43 *Me. L. Rev.* 53, 64 (1991); despite much lore the contrary, it appears that it is actually

more difficult to assess the credibility of oral than of written testimony. Michael J. Saks, "Enhancing and Restraining Accuracy in Adjudication," 51 *L. & Contemp. Probs.*, Autumn 1988, pp. 243, 263-64. Appellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is highly limited because the reviewing court lacks direct access to the witnesses (which may be a mixed blessing, however, if Professor Saks is correct), lacks the trier's immersion in the case as a whole, and when reviewing decisions by specialized tribunals also lacks the trier's experience with the type of case under review. See, e.g., *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000); *Fairman v. Anderson*, 188 F.3d 635, 647 (5th Cir. 1999). The administrative law judge thought that Carradine was exaggerating her pain—that it was not severe enough to prevent her from working. Ordinarily this determination would be conclusive upon us, but in this case the administrative law judge based his credibility determination on serious errors in reasoning rather than merely the demeanor of the witness, and when that occurs, we must remand. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Patty Carradine applied for social security disability benefits in 1994, when she was 42 years old, following a back injury from a slip and fall on ice. The administrative law judge acknowledged that Carradine "has a severe impairment . . . . She has upper body pain and right hand numbness. [Medical] records establish objective evidence of a medical condition that would cause limitations of work capacity." In fact, in the years since her back injury caused pain that triggered a protracted search for relief from a large battery of physicians, she has been diagnosed with a variety of ailments, including degenerative disk disease, scoliosis, depression, fibromyalgia, and "somatization disorder," the

last term (along with synonyms like "somatoform disorders" and "somatoform pain disorder") being a fancy name for psychosomatic illness, that is, physical distress of psychological origin. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.07; *Stedman's Medical Dictionary* 528 (27th ed. 2000); *Cass v. Shalala*, 8 F.3d 552, 554 (7th Cir. 1993); *Latham v. Shalala,* 36 F.3d 482, 484 (5th Cir. 1994); *Vaughn v. Nissan Motor Corp. in U.S.A., Inc.*, 77 F.3d 736, 737 (4th Cir. 1996); *Easter v. Bowen*, 867 F.2d 1128, 1129-30 (8th Cir. 1989); Trief *et al.*, *supra*. The issue in the case is not the existence of these various conditions of hers but their severity and, concretely, whether, as she testified with corroboration by her husband, they have caused her such severe pain that she cannot work full time.

While acknowledging as he had to that severe pain can be totally disabling, see, e.g., *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001); 20 C.F.R. §§ 404.1529(c)(4), (d), the administrative law judge gave two reasons for disbelieving Carradine's testimony about the severity of her pain. The first involved the primarily psychological origin not of the pain itself but of its severity. He said, "Psychological testing confirms a finding that the claimant is inclined to exaggerate her account of limitations . . . . Among the findings from the examination and testing, Dr. Martin observed that [Carradine's] psychological stress and personal conflicts likely affected the claimant's account of physical symptoms and ailments. He noted that results of the Minnesota Multiphasic Personality Inventory (MMPI) did not indicate invalid responses or exaggeration of psychological symptoms. However, he noted that her performance indicated somatization. This finding implies she exaggerates the severity of symptoms she reports." It implies no such thing. It implies merely that the source of Carradine's pain is psychological rather than physical. If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.

Pain is always subjective in the sense of being experienced in the brain. The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second. The cases involving somatization recognize this distinction. *Metz v. Shalala,* 49 F.3d 374, 377 (8th Cir. 1995); *Latham v. Shalala, supra,* 36 F.3d at 484; *Easter v. Bowen, supra,* 867 F.2d at 1129. The administrative law judge in our case did not.

His misunderstanding of the point is further shown by his remarking that "medical examiners and treating physicians have not been able to find objective evidence to support [Carradine's] extreme account of pain and limitation." That inability is consistent of course with a psychological origin of the pain. He acknowledged Carradine's long history of treatment. "This extensive and exhaustive treatment," he remarked, "would on its face appear to reflect a severely disabling condition. However, it also appears that the doctors accepted the claimant's complaints at face value and proceeded to treat her in the absence of significant findings upon diagnostic testing and physical examination." Since severe pain is consistent with "the absence of significant findings upon diagnostic testing and physical examination," which would not reveal a psychological origin of pain, the doctors had no choice but to take Carradine's complaints of pain "at face value" and treat her. What is significant is the improbability that Carradine would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining

disability benefits, cf. *Easter v. Bowen, supra*, 867 F.2d at 1130; likewise the improbability that she is a good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms. Such an inference would amount to an accusation that the medical workers who treated Carradine were behaving unprofessionally.

The administrative law judge could not get beyond the discrepancy between Carradine's purely physical ailments, which although severe were not a plausible cause of disabling pain, and the pain to which Carradine testified. He failed to take seriously the possibility that the pain was indeed as severe as Carradine said but that its origin was psychological rather than physical. The evidence that she presented went far beyond a merely self-serving, uncorroborated claim of pain by a malingerer.

The administrative law judge thought Carradine's testimony inconsistent with the activities that she acknowledged engaging in, such as performing household chores and taking walks as long as two miles. Since exercise is one of the treatments that doctors have prescribed for Carradine's pain, and she does not claim to be paralyzed, we cannot see how her being able to walk two miles is inconsistent with her suffering severe pain. And if she was testifying truthfully and against her interest about her daily activities, why did the administrative law judge think she was lying about her pain?

But there is a deeper problem with the administrative law judge's discernment of contradiction. He failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week. *Clifford v. Apfel, supra*, 227 F.3d at 872; *Vertigan v. Halter*, 260 F.3d 1044,

1050 (9th Cir. 2001); *Easter v. Bowen, supra*, 867 F.2d at 1130. Carradine does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework. It does not follow that she can maintain concentration and effort over the full course of the work week. The evidence is that she cannot. The weight the administrative law judge gave to Carradine's ability to walk two miles was perverse: not only is it a form of therapy, but it is not a form of therapy available at work. A clinical psychologist opined that Carradine's attention and concentration are impaired by her focus on pain.

As in this case, the applicant for disability benefits in *Vertigan v. Halter, supra*, 260 F.3d at 1049-50, was "able to go grocery shopping with assistance, walk approximately an hour in the malls, get together with her friends, play cards, swim, watch television, and read. She also took physical therapy for six months and exercised at home. The ALJ relied on this evidence to conclude that Ms. Vertigan's daily activities involved physical functions that were inconsistent with her claims of pain. Yet, these physical activities did not consume a *substantial part* of Ms. Vertigan's day. . . . In addition, activities such as walking in the mall and swimming are not necessarily transferable to the work setting with regard to the impact of pain. A patient may do these activities *despite* pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain or could engage in similar activity for a longer period given the pain involved. As such, we find only a scintilla of evidence in the record to support the ALJ's finding that she lacked credibility about her pain and physical limitations. As revealed by the medical reports, Ms. Vertigan's constant quest for medical treatment and pain relief refutes such a finding." So the court reversed. See also *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998), where the court "questioned whether a claimant with seven years of medical records

detailing repeated complaints of severe pain, who under-goes three back surgeries in the hopes of alleviating that pain and who now lives with a morphine pump implanted in her body, can be found not credible regarding her complaints of pain."

We do not decide that Carradine is in fact entitled to benefits. Maybe she is exaggerating her pain. Maybe we are naïve in doubting Carradine's thespian capabilities or the willingness of physicians to perform intrusive, even danger-ous, therapies on patients whom they believe to be fakers. Maybe even severe pain is not much of a distraction for people at Carradine's vocational level. (Her last job before her back injury was driving a van for a rehabilitation clinic.) These are issues for the administrative law judge to address utilizing whatever body of expert opinion, scholarly or otherwise, may be available to him or within the institu-tional memory of the Social Security Administration. But an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws, *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir. 2002); *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *Adorno v. Shalala,* 40 F.3d 43, 44 (3d Cir. 1994), even if those flaws might be dissipated by a fuller and more exact engagement with the facts. The judgment is therefore reversed and the case remanded to the Social Security Administration for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

COFFEY, *Circuit Judge*, dissenting.  The issue on appeal is whether the administrative law judge's ("ALJ") decision to deny disability insurance benefits to the claimant, Patty Carradine, is supported by substantial evidence. In his decision, the ALJ determined that Carradine's testimony regarding the extent of her allegedly disabling pain was *less than credible*, finding that:

> (1) Carradine's testimony *was not supported by objective medical evidence from the records of her "[m]edical examiners and treating physicians*," R. at 19 (emphasis added);

> (2) Carradine's testimony regarding pain was "*significant[ly] inconsisten[t]*" with *her own account of her "routine daily activities including self-care and household chores," as well as "routinely driving and hobbies such as reading, taking walks, and gardening*," R. at 18 (emphasis added);

> (3) Carradine's credibility "[wa]s *further diminished* by the results of [physical] capacity testing that indicated *her responses were significantly invalid*" because she was exerting "*minimal efforts*" during the exam, *id.*; and

> (4) Carradine's somatization disorder inclined her to "*exaggerate[] the severity of the symptoms she reports.*" R. at 19.[1]

---

[1] I believe it is incumbent that I point out that the majority incorrectly states that the ALJ gave just *two reasons* for disbelieving Carradine's testimony about the severity of her pain. In fact, *the ALJ expressly referenced four independent bases for discrediting Carradine's allegation of disabling pain.* And I believe it is beyond cavil that these four, solid reasons for discrediting Carradine's testimony, together, comprise *more than enough* evidence to support the ALJ's determination that the extent of Carradine's claimed impairment on account of her pain allegations was

(continued...)

For all of these reasons, the ALJ concluded that Carradine's "statements concerning her impairments and their impact on her ability to work . . . [we]re *not entirely reliable*," and thus failed to support her allegation that she suffered from debilitating pain.[2] R. at 27.

The majority's sole basis and reasoning in reversing and remanding—purportedly to allow the ALJ to undertake "a fuller and more exact engagement with the facts"—is that, in the majority's view, the ALJ "based his credibility determination on *serious errors* in reasoning rather than merely the demeanor of the witness."[3] After reviewing the record,

---

(...continued)
incredible (particularly considering the "substantial evidence" standard requires "no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000)).

[2]  Ms. Carradine is a 54-year-old white female who, according to an assessment done by Dr. Karl Manders and physical therapist Kim Wagler in June of 1993, claimed to suffer from "constant burning pain [in her mid back], occasional headaches . . . muscle spasms, and right hip pain" on account of a February 1993 slip-and-fall accident. R. at 266. This initial evaluation further noted that Carradine's rehabilitation goal was to return to work, and that her rehabilitation potential was "good." *Id.*

[3]  The majority utterly fails to support its creative assertion that the ALJ's credibility determination was somehow based on these so-called "errors in reasoning" as opposed to Carradine's demeanor and presentation at the hearing. While the majority is apparently suggesting that the ALJ "erred" in stating that Carradine's somatization disorder "implies [that Carradine] exaggerates the severity of the symptoms she reports," as I explain later, it is an accepted medical fact that somatics *do tend to exaggerate the severity of their symptoms*, *see infra*; thus, the ALJ's explanation and reasoning was proper and was *not* in "error" as
(continued...)

I am forced to disagree with the majority's broad and un-supported conclusion that there were "deep logical flaws" in the ALJ's reasoning, much less that his decision warrants reversal. By casting aside the well-supported credibility determination of the ALJ, who (unlike any judge on this panel) witnessed Carradine's testimony firsthand, the ma-jority insists on running roughshod over longstanding principles of deference that continue to govern this Court's appellate review of decisions by administrative law judges.

Because this case is so fact-intensive, and involves a wealth of medical evidence from doctors, physical thera-pists, psychologists, as well as vocational experts, I have thoroughly reviewed the materials before the court and have made every attempt to make a complete record on review. Furthermore, I trust I have made clear in this opin-

---

(...continued)

the majority claims. Moreover, this was not the only stated reason the ALJ rejected Carradine's pain allegations.

Instead, the ALJ set forth *three other reasons* he found Carradine's testimony incredible—namely, (1) the lack of ob-jective medical evidence supporting her pain claims; (2) the fact she *overstated* her physical limitations on a previous strength test by giving "minimal efforts"; and (3) the inconsistency between her daily activities and her complaints of constant, disabling pain. These factors provide *more than substantial evidence* to support his credibility determination.

Furthermore, *it is undisputed that as the judge presiding over her benefits hearing, the ALJ had the "best 'opportunity to observe [her] verbal and non-verbal behavior . . . focusing on [her] reactions and responses to the interrogatories, [her] facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns."* United States v. Tolson, 988 F.2d 1494, 1497 (7th Cir. 1993). And as this Court has long held, this places the ALJ in a *superior position* to render credibility determinations as he did here. *See infra* at 29-35.

ion why I am convinced that the ALJ's credibility determination and his decision to deny the claimant benefits *are* supported in the record with *substantial evidence*, and I would thus affirm the district court's judgment upholding the decision. I respectfully dissent.

There can be no doubt that the law mandates that our Court on review, after considering the record in its entirety, must uphold an ALJ's decision to deny disability benefits to a claimant as long as the ALJ's ruling *is supported by substantial evidence and is without any error of law. See* 42 U.S.C. § 405(g); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). The substantial evidence standard "requires no more than '*such relevant evidence as a reasonable mind might accept as adequate to support a conclusion*.' " *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (emphasis added). Furthermore, in reaching our "substantial evidence" determination, this Court's review and evaluation of the record is limited; when "*review[ing] the record as a whole*," we are "*not allowed to substitute [our] judgment for the ALJ's 'by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility*.' " *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasis added) (quoting *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)).

With respect to this Court's treatment of a credibility assessment by the ALJ, there has developed a firm and tenable rule of law "*that an ALJ's credibility determination will not be disturbed unless it is **patently wrong**.*" *Cannon*, 213 F.3d at 977 (emphasis added) (internal quotation omitted); *see also Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir. 1990). As this Court has previously observed, this is a "*strict standard for reversal*," *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (emphasis added), for a "*credibility determination by the ALJ, adopted by the Secretary, is entitled to considerable deference.*"

*Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993) (emphasis added) (citing *Steward v. Bowen*, 858 F.2d 1295, 1302 (7th Cir. 1988)).[4] Thus, "after review [of the entire record and evidence therein,] *we must accept the findings of the ALJ*"— *and most certainly the ALJ's credibility determinations*—"*if supported by substantial evidence*." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (emphasis added). The majority has embarked upon a course of reasoning that is far afield of this principle.

## I. *Objective Medical Evidence*

In denying Carradine's disability claim, the ALJ stressed in his opinion the lack of objective medical evidence verifying her asserted disability. Indeed, as the record reveals, Carradine sought medical attention from a vast number of specialists (some thirteen doctors) for a period of over seven years following her February 1993, slip-and-fall accident—but *these medical records, and the findings inscribed therein, fail to substantiate the alleged severity of pain and resulting limitations claimed by Carradine to the standard of making her eligible for benefits*.[5]

---

[4] The majority acknowledges this high degree of judicial deference granted to "specialists such as the administrative law judges of the Social Security Administration," conceding that "[a]ppellate review of [their] credibility determinations . . . is highly limited." It then fails to follow and circumvents its own statement of the law, and indeed goes on to obscure this prescribed level of deference, by somehow creating alleged errors (which it somehow interprets as errors in reasoning) that the ALJ is said to have made.

[5] At the time of her accident, Carradine was classified as an addiction counseling aide at the Wabash (Indiana) Addiction Care Center, while actually serving as a transport driver—a

(continued...)

(...continued)

position which she had filled for about eight years. (Prior to her work as a counseling aide, Carradine had worked as a production line assembly worker.) On February 16, 1993, a few days after her accident, she began receiving workers' compensation related to her fall and injury. According to a "Report of Claim Status" form that was filed with the State of Indiana Worker's Compensation Board, these benefits ceased on June 8, 1993, for the reason that "*Recent* medical evidence indicate [sic] your current treatment *is not related to your fall at work.*" R. at 160 (emphasis added). This same form notes that Carradine disagreed with the decision to terminate her benefits.

Two months later, in August of 1993, she returned to her job and, according to her testimony before an ALJ, she worked out an agreement with her supervisor to perform lighter work. The Care Center later terminated her in February of 1994 for failing to follow clinic procedures. While the record fails to specify what procedures Carradine ignored (she stated that it was for missing work), she testified that her termination was *not* for avoiding any lifting at work following her accident, as the following exchange between the ALJ and Carradine at her April 1995 hearing demonstrates:

ALJ:        So you worked from August of '93 to February of '94 in a job and you did not have to do any lifting. Is that correct?

Carradine:  I didn't do any.

ALJ:        *Why were you terminated?*

Carradine:  *Failure to follow procedures.*

ALJ:        Pardon me?

Carradine:  Failure to follow procedures is what they stated.

ALJ:        And what did you fail to do?

Carradine:  Nothing.

(continued...)

Carradine's medical history is as follows: in March 1993, a month after she suffered her injury in the slip-and-fall accident, she visited C.S. McMarrow, a chiropractor, who noted that x-rays of the plaintiff's spine revealed nothing but a *mild to moderate* degenerative disc disease and scoliosis. In June and July of that year, when Carradine attended a pain management program at the Community Hospital (Indianapolis) Center for Pain (on referral of her rheumatologist), the Medical Director of the Center, Karl Manders, M.D., remarked that Carradine's participation in the program was successful: she met her goals during the

---

(...continued)

ALJ:        Well, what did they allege that you failed to do?

Carradine:  I had started, I had missed work—

ALJ:        *You weren't fired for not lifting anything, were you?*

Carradine:  *No.*

R. at 47 (emphasis added). When this topic came up at her April 2000 hearing before ALJ Bernstein, Carradine did not specifically state that her termination was related to her slip-and-fall accident; instead, she stated: "There was no just cause . . . . I had missed a lot of work. In the six months that I returned after my fall, I was having to have a lot of help . . . ." R. at 99-100.

Within the next month after her termination, on March 3, 1994, Carradine applied for disability insurance benefits with the SSA, alleging that she "became unable to work because of [her] disabling condition on February 3, 1994," and that "[she is] still disabled." R. at 146. There is no evidence in the record establishing that, since that time, Carradine has made any attempt to apply for alternative gainful employment. The record shows only the following information based on a colloquy between Carradine and the ALJ: "ALJ: How long did you do [your job as a counseling aide]?; Carradine: I'm thinking it was 5 or 6 years.; ALJ: That's the last job that you had, when you stopped?; Carradine: Yes." R. at 99.

program, improved her ranges of motion, experienced decreased pain and muscle spasms, and experienced an improved ability to sleep. Dr. Manders noted that her over-all prognosis "should be good." R. at 251.

A year later, in May 1994, Susan Steffy, M.D. conducted an in-depth physical, musculoskeletal and neurological ex-amination of Carradine, and even after conducting all three of these exams, did not ascertain any medical basis for Carradine's subjective complaints of pain. Dr. Steffy noted that Carradine *was able to walk, hop and squat "without any difficulty,"* and that *she got on and off the examination table with ease*. The doctor further reported that Carradine *maintained a normal posture and gait*, normal muscle and grip strength, normal range of motion in her back, exhibited *no swelling in her joints*, and also evidenced a normal ability to manipulate and experience sensation in her fingers. According to Dr. Steffy, although Carradine's active range of motion in her neck was just "slightly" decreased, her passive range of motion was entirely normal. Based on these observations, *Dr. Steffy concluded Carradine's **only** limitation was her "subjective complaints of pain" (for which there was no present medical cause), and further recommended Carradine pursue a most conservative course of treatment (namely, non-steroidal anti-inflammatories (such as Aspirin), neck exercises and application of local heat).*

As for *Carradine's laboratory tests*, a magnetic resonance imaging ("MRI") test conducted in September 1994 *revealed mild narrowing of the cervical spine, slight flattening of the dorsal spinal cord, and absolutely no disc herniation.* An *electromy-*

*ogram ("EMG")[6] taken a month later* (October 1994) *likewise revealed no abnormal findings.*

Between August 1994 and December 1995, Carradine visited and was treated by another doctor, Samuel Goodloe, M.D., *an anesthesiologist specializing in the "diagnosis and treatment of pain."* R. at 346. According to Dr. Goodloe, Carradine complained of some numbness in the ring and little fingers on her right hand, tenderness in her back, and slightly abnormal deep tendon reflexes. *Upon examination*, he reported *Carradine had a supple neck and normal sensation in the lower extremities, her straight-leg raising tests were negative, and she walked without difficulty.* As far as Carradine's claims of numbness were concerned, a *current perception threshold test administered by Dr. Goodloe in December 1995 revealed that the plaintiff had anywhere from "no [sensory] abnormalit[ies]" to only "mild" sensory dysfunction and increased nerve sensitivity.* R. at 352 (emphasis added).

Some four years thereafter (April 1999), at the request of ALJ Bryan Bernstein, *Brett Windsor, a physical therapist, performed a functional capacity evaluation on Carradine.* During the evaluation, Windsor observed Carradine perform various physical tasks, and noted that, *while she failed twenty of the thirty validity criteria for those tasks, four of these failures (i.e., **20% of these failures**) were due to her exerting only "minimal efforts" during testing.* He remarked that his finding that Carradine *exerted only "minimal efforts" during testing*

---

[6] An EMG is a "test . . . used to record the electrical activity of muscles . . . ." *See* "What is an Electromyogram?", *available at* http://www.medicinenet.com/electromyogram/page1.htm. EMGs may be used "to detect abnormal muscle electrical activity [and] can also be used to detect true weakness, as opposed to weakness from reduced use because of pain or *lack of motivation*." *Id.* (emphasis added).

*was supported by her physiological responses during the isometric strength test, as well as her results on the hand dynanometer ("squeeze") test.* R. at 483. In spite of Carradine's decision to exert only "minimal efforts," Windsor was nonetheless able to conclude from a compilation of his testing that the plaintiff was "*capable of repetitive gripping on a frequent to constant basis,*" was "*able to lift up to 20 [lbs.] occasionally, 10 [lbs.] frequently, and negligible amounts constantly,*" could "*sit constantly, stand constantly, and walk constantly,*" and was fully "*able to climb stairs on a frequent basis,*" R. at 483. Most importantly, Windsor determined and advised Carradine that she was "*capable of sedentary work.*" *Id.*

A short time after these strength tests, Carradine made two brief visits to *hospital emergency rooms* in the summer of *1999*, complaining of *increasing pain in her neck and back.* Upon examination, Carradine's emergency room doctors reported some limited range of motion in her neck and back, but concluded that Carradine enjoyed *a full range of motion in her shoulders and upper extremities, negative straight-leg tests, and excellent muscle strength.* Furthermore, Dr. Bainbridge (her emergency room doctor during the August 1999 visit) noted she *exhibited only "slight" tissue swelling in her back, and Dr. Mann (her examining physician during the July 1999 visit) noted "no swelling" upon examination.*

As far as *Carradine's mental condition* is concerned, in June of 2000, at the SSA's request, *Carradine underwent a thorough psychological evaluation* administered by Dr. Henry Martin, a clinical psychologist. After the evaluation, *Dr. Martin also submitted an assessment of Carradine's ability to perform work-related activities.* R. at 620-21. Although *Dr. Martin* did *diagnose Carradine as suffering from somatization disorder,* defined as "*the conversion of mental experiences or states into bodily symptoms,*" *Dorland's Illustrated Medical Dictionary* 1546 (27th ed. 1988) (hereinafter *Dorland's*) (emphasis added), his assessment of Carradine's work-related capabilities *fell short*

*of supporting the claimant's pain allegations and her alleged limitations on her ability to work.*

After all, Dr. Martin described Carradine as being neatly groomed, cooperative and friendly, and, *in 17 out of 22 different functional areas, Dr. Martin rated Carradine's capabilities[7] as "good to excellent."* These areas included (but were not limited to) her *ability to understand and execute simple as well as detailed instructions, to interact appropriately with the public, to get along with co-workers, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places or use public transportation.* As for the remaining five functional areas (namely, Carradine's concentration, her ability to perform within a schedule, complete a work day, perform at a consistent rate, and to sustain work without special supervision) *Dr. Martin rated Carradine as performing at a "fair" level—and this "fair" rating obviously falls short of qualifying as a severe impairment that significantly limits an individual's ability to do basic, light work activities.[8] Indeed, the fact that Carradine did not receive a single "poor" rating further supports that nothing regarding her psychological state would prevent her from performing light work.[9]*

Although there were *other occasions between the time of her injury* and the ALJ's decision when Carradine sought medical attention, *these other physician visits*, similar to those just

---

[7] According to the source-statement form completed by Dr. Martin, "excellent" signifies that one's "ability is not limited," while "good" infers that "the individual can perform the activity satisfactorily most of the time."

[8] "Fair" signifies that "the individual can perform the activity satisfactorily some of the time."

[9] A rating of "poor" means that the person has "no useful ability to function" in that discrete ability category.

described, *consistently failed to establish a disabling condition.* As such, her medical history was succinctly and accurately set forth in the ALJ's decision as a basis for finding that her condition *demonstrated physical and mental conditions that are most unlikely to produce disabling pain, which is pain that must be "constant, unremitting, and wholly unresponsive to thera-peutic treatment" for it to qualify someone for social security benefits.* Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994) (em-phasis added) (internal quotations omitted). Thus, upon review, *I remain convinced that there is no reason to find fault with and cast heated aspersions on the ALJ's conclusion*[10] *that the "claimant's statements concerning her impairments . . . and their impact on her ability to work . . . are not entirely reliable,"* R. at 27, realizing that *we are obliged to follow the law that "an ALJ's credibility determination will not be disturbed unless it is patently wrong."* Cannon, 213 F.3d at 977. While I certainly sympa-thize with the plaintiff's alleged medical problems, which she has recounted so eloquently since her slip-and-fall accident of some ten years ago, based upon the record and findings before us *I am forced to remain, like the ALJ, a "doubting Thomas" as to the veracity of Carradine's claims*

---

[10] Notably, ALJ Bernstein is not the first judge to find Carradine's claim of disabling pain incredible: in a decision and order dated September 11, 1996, *the previous ALJ to address Carradine's claim (ALJ Donahue) similarly stated that she did not "find the claimant to be totally credible."* R. at 322 (emphasis added). Nor was Judge Bernstein the first (or the last) to deny Carradine's claim. Prior to Judge Bernstein's order, Carradine's benefits claim was denied by the SSA initially and upon reconsideration, as well as by the prior ALJ. And since Judge Bernstein entered his order, the Appeals Council denied review, and the district court affirmed his decision to deny benefits. All told, *five* different reviewing entities have refused Carradine's claim for disability benefits on a total of *six different occasions*. *See infra* note 28.

*of pain.* Such claims must be looked at with a balanced, though not a jaundiced view; and in this case, *the record so eloquently displays that the ALJ **did** conduct a most thorough balancing test, and ultimately reached a well-reasoned conclusion that Carradine's testimony was unreliable.*

Meanwhile, the majority's very surprising opinion can best be read and logically interpreted as *trivializing the lack of objective medical evidence in Carradine's case*. Why my colleagues adopted this approach is a most disturbing mystery. After all, the majority of accepted and well-reasoned legal authority emphasizes the significance of, *and this Court's continued reliance on, objective medical evidence when rendering social security disability determinations.* When determining whether an individual qualifies as "disabled,"

> *[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ;*
>
> *. . . Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.*

42 U.S.C. § 423(d)(5)(A) (emphasis added).[11]

---

[11] Although Section 423(d)(5)(A) formally applies only to eligibility determinations for disability insurance benefits made prior to January 1, 1987, *see* Social Security Disability Benefits Reform Act of 1984, Pub. L. No. 98-460(3)(a)(3), 98 Stat. 1794, 1799 (1984), "[Section 423(d)(5)(A)] still appears in the statutory codification and decisions have continued to be rendered under it . . . ." *Craig v. Chater*, 76 F.3d 585, 593 (4th Cir. 1996); *see also Moothart v. Bowen*, 934 F.2d 114, 116 n.1 (7th Cir. 1991) (*noting that applicable*

(continued...)

Social Security Administration regulations, as codified at 20 C.F.R. §§ 404.1529 and 416.929, provide the authoritative standards for evaluating pain in disability determinations and further "incorporate the standard set forth in section 423(d)(5)(A)." *Craig v. Chater*, 76 F.3d 585, 593 (4th Cir. 1996). These regulations emphasize the importance of objective medical evidence:

> Objective medical evidence is evidence obtained from the application of *medically acceptable clinical and labor-atory diagnostic techniques.*
>
> *. . . Objective medical evidence of this type is a useful indica-tor to assist [the SSA] in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms and the effect those symptoms, such as pain, may have on [the claimant's] ability to work. [The SSA] must always attempt to obtain* **objective medical evidence** *and, when it is obtained, [the SSA] will consider it in reach-ing a conclusion as to whether [the claimant is] dis-abled*.

20 C.F.R. § 404.1529(c)(2) (emphasis added); *see also* 20 C.F.R. § 416.929(c)(2). The regulations further state that the *SSA will consider and weigh all of the available evidence in evaluating the intensity and persistence of one's symptoms, such as pain, including "medical history, the medical signs and laboratory findings, and statements by [the claimant's] treating or examining physician or psychologist or other persons about how [the claimant's] symptoms affect [her]."* 20 C.F.R. §§ 404.1529(c)(4) & 416.929(c)(4) (emphasis added). *The SSA must then examine the alleged consistency between the subjective*

---

(...continued)
*regulations are identical to this standard and that this "statutory language still provides analytic[al] guidance"*) (emphasis added).

*claims of pain and the objective evidence when "determin[ing] the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical and scientific medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [her] ability to work."* 20 C.F.R. § 404.1529(a) (emphasis added); *see also* 20 C.F.R. § 416.929(a).

Reflective of these regulations, this Circuit and many of our sister circuits, in circumstances similar to those presented here, have explained that *a lack of objective medical evidence—evidence that is based upon accepted medical studies and evaluations combining the use of x-ray, MRI, cat scans, and other recognized and reliable techniques—supporting a claimant's declaration of severe pain, while not conclusive nor exclusive, will greatly inhibit the finding of disability. See*, *e.g.*, *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) ("[T]he ALJ *must consider a claimant's subjective complaint of pain **if** supported by medical signs and findings.*" (emphasis added)); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (" 'Although we cannot discredit a complaint of pain simply because objective medical evidence was not introduced to support the extent of the pain, *n[or] are we required to give full credit to every statement of pain* . . . .' ") (emphasis added) (quoting *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993)); *see also Craig*, 76 F.3d at 595 ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they [certainly] need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers*. . . ." (emphasis added)); *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) ("The *[Social Security Disability Benefits Reform] Act*, regulations

and case law *mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings.*" (emphasis added)).

Indeed, the *majority's willingness to rely solely on a claimant's subjective testimony creates an increased likelihood of error*, runs counter to the intent of Social Security law, and possesses a greater "*potential for manipulation because outward manifestations of pain can easily be contrived by a calculating claimant*. . . ." *Cline v. Sullivan*, 939 F.2d 560, 568 (8th Cir. 1991) (emphasis added); *see also Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996) (stating that *this Court is not "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work*") (internal quotations omitted). The majority concedes the danger of relying on purely subjective evidence of pain when it professes at the beginning of its opinion that "*[a]pplicants for social security benefits who claim to be disabled from working because of extreme pain make the job of a social security administrative law judge a difficult one*." This comment turns out to be a self-fulfilling prophecy, as the *majority essentially relies on nothing but Carradine's subjective claims of pain, as well as her husband's statements, and opines that the ALJ must also agree with such allegations of pain—even in spite of the fact that the ALJ finds the claimant's account to be incredible and has numerous logical reasons to support such conclusion.* Indeed, *it is precisely decisions of the nature rendered by the majority today that will serve to make the job of an ALJ, as well as the task of reviewing courts, a most difficult one.*

To be sure, the majority's opinion will create a troublesome incentive among those whom the majority refers to as "unscrupulous applicants," who tend to "exaggerate [their] pain without fear of being contradicted by medical evidence." All other things being equal, individuals are more apt to pursue false claims when the cost to them of seeking

potential benefits is lower. With that in mind, we may as well note the obvious that, from a claimant's perspective, it costs nothing for her merely to testify on her own behalf, with the aid of her husband only—something she must do anyway in the course of advancing her claim. In contrast, the cost of her obtaining witnesses and presenting objective medical evidence supporting a claim of disabling pain will invariably be higher (a factor which tends to *reduce* the frequency of frivolous lawsuits).

Another principle that I believe we can all agree upon is that *subjective claims made by persons who have a history of being discharged from their latest employment for failure to report for duty (missing work), and who thereafter have sought public disability benefits, are generally far less reliable than objective medical evidence regarding such claims. Even the majority concedes this point (at least to some degree) by stating that* "determinations of credibility are fraught with uncertainty." Thus, if a claimant's only evidence supporting the alleged severity of her pain is her own testimony, an *ALJ's ability to detect claims that are based on untruths is severely impaired, making his job almost impossible.*[12] For all of the foregoing

---

[12] The majority quotes language from *Cooper v. Casey*, 97 F.3d 914 (7th Cir. 1996), which reads: "Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition. To insist in such a case, as the social security disability law does not . . . that the subjective complaint, even if believed by the trier of fact, is insufficient to warrant an award of benefits would place a whole class of disabled people outside the protection of that law." *Cooper certainly falls far short of establishing what the majority suggests it does—namely, that subjective claims of suffering from severe pain are alone sufficient in Social Security benefits cases.* Most notably, *the portion of the Casey decision discussing Social Security benefits was dictum, see Casey*, 97

(continued...)

reasons, it is clear that the approach the majority countenances and espouses will invariably lead to a rapid and consistent increase in the number of claims filed, many of which, I'm afraid, will be contrived, fraudulent, and most difficult to control.

Considering the law and economics impact of this decision, *I wonder whether the author of the majority opinion, along with my other colleague who joins in that opinion, has fully considered the possible financial impact on taxpayers and the insurance industry as a whole that will result from casting to the birds the requirement that* **the fact-finder (in this case, the ALJ) consider all of the available objective medical evidence (or lack thereof)** *when evaluating a claimant's account of severe pain.* Courts would be well-advised to be "*justly concerned with proposed changes in law that would foster additional litigation,*" *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1161 (7th Cir. 1997), *and take into consideration the weighing of the "consequences—the benefits and the costs—of attempting to prevent [the] harms," of having non-meritorious disability claims succeed in the legal system.* Richard A. Posner, *Overcoming Law* 396 (1995) (emphasis added); *see also Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 510 (7th Cir. 1997) (Posner, C.J., concurring in part and dissenting in part) (*exhorting judges to create legal principles that will deter unlawful conduct "without imposing an unreasonable burden" on*

---

(...continued)
F.3d at 916-17; *that case did not even involve a claim for Social Security benefits but rather was an appeal from a § 1983 action by prison inmates claiming that guards had beaten them and refused to give them necessary medical assistance. Id.* As to the three cases that *Casey cites in support of the language from which the majority quotes, none spoke as strongly in endorsing the use of only subjective testimony as that penned in Casey—this is true even of Sarchet v. Chater,* 78 F.3d 305 (7th Cir. 1996), the only Seventh Circuit case cited.

*businesses*). A decision of the nature made by the majority today certainly falls short of these admired, accepted, and well-reasoned goals. (Indeed, one need not wonder why the federal deficit is so high if we are to come down with a decision like the majority has penned in this case.)

The majority could respond that it is following the approach commanded by the revisions to the Social Security Disability regulations made in 1991 (which were aimed at clarifying the pain standard in disability determinations) and by our decision in *Pope v. Shalala*, 998 F.2d 473 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999), interpreting the effect of those changes. As this Court recognized in *Pope*, *the regulations in 20 C.F.R. § 1529 continue to require objective medical evidence of the existence of an underlying medical impairment that "could reasonably be expected to produce the pain or other symptoms alleged. . . ."* 20 C.F.R. § 404.1529(a) (emphasis added); *see also Pope*, 998 F.2d at 482. However, this Court also concluded in *Pope* that *the SSA's revised regulations "worked to supersede this circuit's restrictive test"* articulated in "cases such as *Moothart v. Bowen*, 934 F.2d 114, 116 (7th Cir.1991), and *Walker v. Bowen*, 834 F.2d 635, 641 (7th Cir.1987), [which] ha[d] *limited the use of pain in making a disability determination to only those complaints the intensity and persistence of which are supported by objective medical evidence*." *Pope*, 998 F.2d at 482, 485 (emphasis added).[13] In other words, the law of *Pope* only states that an ALJ may not reject

---

[13] 20 C.F.R. § 1529(c)(2), while acknowledging the need for ALJs to look at objective medical evidence, states that "[the SSA] will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements."

a claimant's account of disabling pain "simply because the objective medical evidence may not support the extent of pain claimed by [the claimant]." *Id.* at 486.

Be this as it may, the majority's transgression in this case (discussed in detail *infra*) is its willingness to cast aside and attempt to take issue with the ALJ's well-reasoned and detailed finding that Carradine's subjective *claims of severe and constant pain were incredible, when that finding was based only partially on the absence of objective medical evidence supporting the alleged pain. It is precisely in cases such as this one—where the only evidence purportedly supporting a finding of disability from pain is nothing but the claimant's own self-serving, subjective accounts of her alleged pain—that appellate courts should always be mindful of the mandate that we are obligated to be most deferential to an ALJ's reasoned credibility finding.* After weighing the evidence, *the ALJ concluded that Carradine's subjective complaints were less than credible, and thus failed to meet the prerequisite for subjective claims of severe pain to overcome the absence of objective evidence. See Herron*, 19 F.3d at 335*; Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

In fact, *the ALJ in this case dutifully followed the majority's admonition to "be alert to [the unscrupulous applicant who exaggerates his or her pain without fear of being contradicted by medical evidence], and evaluate the applicant's credibility with great care*." It is quite obvious that *the ALJ meticulously weighed all the factors, including those supporting and undermining Carradine's credibility*, and came to a well-balanced and reasonable decision that, *due to their unreliability, her claims **fell far short** of overcoming the lack of objective medical evidence in the record of the alleged severity of her pain.*

Unlike the majority, I must stress that it was indeed most proper for the ALJ to consider the paucity of objective evidence in rendering his ultimate decision that Carradine was not disabled. If courts and administrative agencies

devalue the need for verifiable evidence of pain—as the majority surely seems to do—then we may as well ring the dinner bell for any and all potential applicants to come and feed at the ever-diminishing public trough of social security benefits. *A more reasoned and reliable course of action would be to continue to mandate that objective medical evidence (or the lack thereof) properly continue to be a* **most significant factor** *in determining the intensity and persistence of a claimant's pain* and, consequently, her eligibility for disability benefits. *See, e.g., Luna v. Shalala*, 22 F.3d 687, (1994) (noting that the ALJ must first determine whether the claimant's allegation of pain is substantiated by objective medical evidence and, if not, the *ALJ must consider other factors, including daily activities, prior work record, etc.*); *see also* 20 C.F.R. § 404.1529 ("*In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history [and] medical signs and laboratory findings . . .*"). To the extent that the majority opinion will be read as disregarding or diminishing the role of objective evidence, it should be rejected and viewed with suspicion.

## II. *Subjective Accounts of Pain*

Given the lack of objective medical evidence supporting a disability finding in this case, *Carradine's claim may succeed (if at all) only insofar as her own subjective accounts of pain are found to be credible and adequate to support a determination of disability.* The law is clear that "*the disabling extent of the claimant's pain is a question of fact [to be determined by] the ALJ,*" *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990) (per curiam) (emphasis added), and, pursuant to 42 U.S.C. § 405(g), " '[t]he *findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .' *", *Butera*, 173 F.3d at 1055 (quoting 42 U.S.C. § 405(g)) (emphasis added).

As the author of the majority opinion in this case recently wrote, an ALJ's "finding [that a claimant exaggerated her physical limitation is] *a **well-nigh unreviewable** determination of credibility.*" *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (emphasis added). Indeed, based upon an ever-growing wealth of case law, our deference to the ALJ's credibility determination is exceedingly wise, because the trier of fact (in this instance *the ALJ*):

> *has the best "opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements," as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.*

*Tolson*, 988 F.2d at 1497 (first emphasis added with second emphasis in original) (quoting *Churchill v. Waters*, 977 F.2d 1114, 1124 (7th Cir. 1992)).

> *I am thus forced to disagree with the majority's dubious and fallacious and unsupported assertion that "it is actually more difficult to assess the credibility of oral than of written testimony."* Based upon more than twenty years of trial experience combined with my basic knowledge from treatises and writings that I have studied, I find that a statement of this nature could not be more inaccurate. As the above-quoted language from *Tolson* explains, the trier of fact, whether a judge or a jury of twelve citizens, *has the opportunity to observe a witness's responses and demeanor with his or her own eyes and ears.* The *trier of fact*, thus, is *unquestionably far better equipped to assess a person's credibility than someone who later reads a witness's testimony from a faceless transcript containing only black type on white paper.*

It is indeed surprising, if not confounding, that the author of the majority opinion attempts to downplay the impor-

tance of in-person witness testimony in this manner, considering that he, on other occasions, has opined that "[s]o much goes on in the courtroom that the written record can never reveal. *Why else do we routinely grant so much deference to the trial judge, who sees and hears the witnesses firsthand, who supervises the trial from start to finish* . . . . *Our acquiescence in the decisions of the trial court is dictated as much by pragmatism as by principle.*" *Bracy v. Gramley*, 81 F.3d 684, 702 (7th Cir. 1996) (emphasis added), *rev'd on other grounds*, 510 U.S. 899, 117 S. Ct. 1793 (1997).

Similarly, in *Taliferro v. Augle*, 757 F.2d 157, 160-61 (7th Cir. 1985), the author of the majority emphasized the propriety of this Court's deferral to a decision to deny a motion for new trial made by a trial judge in the context of a 1983 action. In rendering a decision to uphold a trial judge's determination not to grant defendants a new trial, this Court reasoned that *the trial judge had viewed the witnesses' testimony firsthand, while the court of appeals panel had not*; thus the trial judge was in a better position to assess the appropriateness of granting a new trial:

> *[I]t is not our role to play district judge and decide whether we would have decided the motion for a new trial as he did. **We cannot put ourselves in his shoes; we did not see the witnesses testifying, or the jurors listening to the testimony.*** . . . [Because] we cannot say from the evidence in the appellate record that the jury would have been unreasonable to evaluate the testimony as we have just suggested it may have done, we cannot call the judge unreasonable in refusing to grant the defendants a new trial; and we certainly cannot say that he was "inescapably wrong["] . . . .
>
> *Id.* at 160-61.

Indeed, as the author of the majority further noted in *Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269,

272 (7th Cir. 1993) (emphasis added), "[l]ive witnesses *make a more forceful impression* [than written testimony]."[14]

For all of these reasons articulated by the authoring judge in other contexts, the majority's current notion that the credibility of written testimony is easier to assess than that of live testimony would most certainly be a troubling and a wholly novel mindset for this Court to adopt.[15] As this

---

[14] My other colleague in the majority has similarly authored opinions emphasizing this Court's deference to credibility determinations of the trial judge based on his superior position to observe witnesses firsthand. *See, e.g., United States v. Roe,* 210 F.3d 741, 749 (7th Cir. 2000) (" 'We defer to the sentencing judge's credibility determinations because the presiding judge while listening to the witnesses' testimony *is in the best position to observe, weigh, and evaluate a witness' verbal as well as nonverbal behavior.*' ") (emphasis added); *Knight v. Chater*, 55 F.3d 309, 334-35 (7th Cir. 1995) (citing *Herron v. Shalala*, 19 F.3d 329 (7th Cir. 1994) and *Luna v. Shalala*, 22 F.3d 687 (7th Cir. 1994) in support of the proposition that deferral to credibility determinations made by the ALJ is proper, for he in the "best position to observe witnesses"). He has also joined in opinions outlining the well-settled principle of this Court's deference to the fact-finding capabilities of the trial court. *See, e.g., Aviles v. Cornell Forge Co.*, 241 F.3d 589, 594 (7th Cir. 2001) (noting this Court's deference to trial judge's fact-finding determinations "because of the trial court's *superior ability to judge the credibility of the witnesses*") (emphasis added); *United States v. Jensen*, 169 F.3d 1044, 1046 (7th Cir. 1999) ("We defer to the trial court's credibility determinations because 'only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.' ").

[15] I fail to understand and am forced to disagree with the majority's reliance on *Professor Saks's article* to lend credence to its statement, for *the article does not support the proposition that written*

(continued...)

(...continued)

*testimony is **more** accurate than oral testimony.* The majority claims "*it is actually more difficult to assess the credibility of oral than of written testimony.*" Although Saks's compilation of social science research does suggest that the use of transcripts in detecting witness credibility is "not dramatically worse" than live testimony that includes the observation of facial demeanor, Saks's data *ultimately establishes that viewing a witness in person (whether by viewing his entire body or just his face) is a **statistically superior** method of determining witness credibility as compared to viewing only the transcript of a witness's testimony.* Michael J. Saks, *Enhancing and Restraining Accuracy in Adjudication*, 51 L. & Contemp. Probs., Autumn 1988, 243, 263-64 (Table 4) [hereinafter Saks, *Enhancing Accuracy in Adjudication*]. Thus, Saks's study in fact *supports* what this Court has long held, and a principle I continue to espouse—that the trier of fact, who has "the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses" in this Carradine case, "focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns," *Tolson*, 988 F.2d at 1497, is in a *superior position* to determine a witness's credibility than a panel of appellate judges who "merely look[] at the cold pages of an appellate record." *Id.*

In this case, the ALJ observed the witness testify *in person*—and thus had the opportunity to view her *entire body, including her movements, tremors, perspiration, etc.* Thus, the fact-finder (ALJ) employed *a method of digesting witness testimony that Saks demonstrated to be **statistically superior** at detecting deception than the use of only a transcript.* *See* Saks, *Enhancing Accuracy in Adjudication*, *supra*, at 264 (Table 4).

One final note regarding this study is that Saks's data is limited to the perceptions of *laypersons*, *see id.* at 263, as contrasted with those of highly-trained, experienced and knowledgeable judges

(continued...)

Court has *always* recognized, when determining credibility, *a presiding judge is in the "best position to see and hear the witnesses and assess their forthrightness." Powers*, 207 F.3d at 435 (emphasis added); *accord Chicago Tribune Co. v. NLRB*, 974 F.2d 933, 934 (7th Cir. 1992) ("What is true is that an administrative law judge's determinations of credibility are entitled to a certain weight by a reviewing court, because he sees and hears the witnesses and the Board has only a transcript of their testimony."). Because credibility determinations involve ambiguous elements that "leave no trace that can be discerned [from a] transcript," *Herron*, 19 F.3d at 335, and because "*[the ALJ is] in the best position to see and hear the witnesses and assess their forthrightness, we afford [an ALJ's] credibility determinations special deference." Powers*, 207 F.3d at 435. Thus, it is well settled that, on appeal, *this Court is not allowed to "reweigh the evidence nor does it reconsider credibility determinations made by the ALJ." Prince v. Sullivan*, 933 F.2d 598, 601-02 (7th Cir. 1991) (emphasis added); *see also Sierra Res., Inc. v. Herman*, 213 F.3d 989, 993 (7th Cir. 2000) ("*[Claimant] is asking this court to substitute our own credibility determinations for that of the ALJ[, the trier of fact],*

---

(...continued)
who *regularly make credibility assessments for all types of claims including disability benefits claims.* Thus, the study is, in any case, of limited applicability to this discussion of an *ALJ*'s capacity to render accurate credibility determinations insofar as the ALJ is (as the majority concedes) a "specialist"—not only in the matter of credibility findings, but also in the area of rendering social security decisions as well. *See* Opinion at 3 (admitting that appellate "*review of credibility determinations [is highly limited], especially when made by specialists such as the administrative law judges of the Social Security Administration[,] [who have] direct access to the witnesses [as well as] immersion in the case as a whole* . . . .") (emphasis added).

*something we decline to do.*") (emphasis added) (citations omitted); *Cannon*, 213 F.3d at 974. Indeed, *absent an error of law, we may only reject the ALJ's credibility determination if it is not supported by substantial evidence*. *Cannon*, 213 F.3d at 974.

In this case, the ALJ had the benefit of viewing the witness firsthand, thus *observing Carradine's "reactions and responses to the interrogatories, [her] facial expressions, attitudes, tone of voice, eye contact, posture and body movements, . . . confused or nervous speech patterns," perspiration, fidgeting, wringing of hands, or shuffling of her feet*. *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002); *accord Tolson*, 988 F.2d at 1497. From his vantage point, the ALJ concluded that Carradine was exaggerating her alleged pain symptoms and that her testimony referring to debilitating and disabling pain was less than credible.[16] *Because the record makes clear that the ALJ's determination is supported by substantial record evidence, I believe, if we are to follow the well-established law regarding review of social security benefits determinations, we are bound to affirm*.

The first factor influencing the ALJ's determination that Carradine's complaints of disabling pain were incredible was the fact that her well-documented medical diagnosis of somatization disorder makes clear that one suffering from this malady all too *frequently "exaggerates the severity of the symptoms she reports*." R. at 19 (emphasis added). Notwithstanding the majority's assertion to the contrary, this conclusion *is* well substantiated in accepted medical

---

[16] The majority writes: "The administrative law judge *thought* that Carradine was exaggerating her pain—that it was not severe enough to prevent her from working." Far from merely "thinking" that *Carradine was exaggerating her pain, the ALJ made a finding of fact that she was exaggerating her pain, to which we owe great deference.*

literature. According to the *Diagnostic and Statistical Manual of Mental Disorders*, which is regarded as a definitive psychiatric authority on mental disorders, "*[i]ndividuals with Somatization Disorder usually describe their complaints in . . . exaggerated terms, but specific factual information is often lacking.*" American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 446 (4th ed. 1994) (hereinafter "*DSM-IV*") (emphasis added). The *DSM-IV* warns that, when diagnosing persons suffering from somatization disorders, "*[o]bjective findings should be evaluated without undue reliance on subjective complaints.*" *Id.* at 448 (emphasis added). In addition, while "*[s]ymptoms that are intentionally produced should not count toward a diagnosis of Somatization Disorder*[,] . . .the *presence of some factitious or malingered symptoms*, mixed with other nonintentional symptoms, *is not uncommon.*" *Id.* at 449 (emphasis added).

Other medical experts have similarly linked somatization and related disorders with a patient's tendency to exaggerate symptoms. According to one source, persons who suffer from a conversion type of *somatoform disorder*, while perhaps suffering some real pain, are at the same time "*prone either to exaggerate the magnitude of their complaints or to present these complaints in a melodramatic fashion*," often "cho[osing] . . . *emotionally laden and flamboyant language [to describe their pain].*" *See* Gerald M. Aronoff, "Evaluating and Rating Impairment Caused by Pain," *in Disability Evaluation* 552, 553 (Stephen L. Demeter & Gunnar B.J. Anderson eds., 2d ed. 2003) (emphasis added). Gerald Aronoff goes on to remark that such patients "*are at high risk for iatrogenic complications,*[17] and should be *managed conserva*

---

[17] "Iatrogenic," when used in this context, is a medical term to describe "disorders induced in the patient by autosuggestion

(continued...)

*tively [by their physicians] unless there are clear signs of objective pathology* warranting more aggressive treatment," *id.;* otherwise, the tendency of the somatic patient to exaggerate his or her symptoms "***often prejudices the clinician***." *Id.*

*Without citing support from medical journals and treatises, much less from case law, and in the face of medical evidence to the contrary, the majority takes issue with the well-founded conclusion that someone suffering from a somatization disorder will, in all probability, tend to exaggerate the severity of her symptoms.* The majority transgresses through a medical fantasyland and somehow contends that a somatization disorder "*implies no such thing. It implies **merely** that the source of Carradine's pain is psychological rather than physical*," *id.* (emphasis added), which (in the majority's view) consequently explains the utter lack of objective evidence "to support [Carradine's] *extreme account of pain and limitation*." *Id.* (emphasis added).

The majority errs when assuming that these dual implications of a somatization diagnosis are mutually exclusive.[18]

---

(...continued)
based on the physician's examination, manner, or discussion[.]" *Dorland's*, *supra*, at 812.

[18] The majority would lead us to believe that, as long as a claimant alleging disabling pain has been determined to have some sort of somatic tendencies, her complaints of pain *must* be considered as genuine and psychiatric in nature. That is, the majority separates the universe of pain complainants into just two categories: (1) those whose pain "experience *is more acute* because of a psychiatric condition"; and (2) those who "*pretend[]* to experience pain, or more pain than [they] actually feel[]." The majority then goes on to opine that the "pain [allegation] is genuine in the first [case,] [*i.e.*], the psychiatric case," while it

(continued...)

---

(...continued)

is "fabricated in the second," *i.e.,* the malingering case. Again, the majority mistakenly views the world of possibilities in "either-or" terms—that is, a patient *either* is a somatic whose pain complaints are real (and more "acute" because of her psychiatric problem), *or* a malingerer who merely fabricates her pain allegation. The majority ignores a *third* possibility—that a person with somatization disorder may feel some "real" pain but, at the same time, may *tend to exaggerate her accounts of that pain, claiming that it is disabling when in fact it is not.*

I disagree with the majority's simplification of the situation, and believe that (as the ALJ explained) a somatic patient who feels real pain (as an expression of stress, for example) *at the same time* may tend to exaggerate that pain on account of her somatic problem. Given that this is the case, *it is certainly possible (and indeed reasonable) for an ALJ to find a somatic patient's complaints of **disabling** pain to be "not entirely credible," as the ALJ did in this case.* Indeed, the Eighth Circuit's opinion in *Metz v. Shalala,* 49 F.3d 374 (8th Cir. 1995), supports this very proposition.

Although the majority cites to *Metz* in support of its statement that pain is "genuine" when caused by a psychiatric condition, while it is "fabricated" when a person is merely pretending to experience a certain amount of pain, *Metz does not* support the majority's overall contention in this case—namely, that we should jettison the ALJ's well-reasoned credibility finding despite the substantial evidence in the record to support it. The Circuit Court in *Metz* in fact *upheld* the ALJ's decision to deny benefits to a somatic, concluding that "inconsistencies in Metz's testimony, lack of severe pain medication, and *the absence of objective medical evidence of severe pain, support[ed] the ALJ's decision to discredit Metz's subjective complaints of pain." Id.* at 377. Indeed, the *Metz* court stressed (as I do in this dissent) that the ***important factor**—particularly in cases where somatic patients allege disabling pain—**is the ALJ's credibility determination**;* and in such cases,

(continued...)

That somatic patients feel *real pain* insofar as their psychological stress may manifest itself in real physical symptoms (pain), *see Dorland's Illustrated Medical Dictionary* 1546 (27th ed. 1988) (describing somatization as "the conversion of mental experiences or states into bodily symptoms"), *does not negate the fact that somatics may and often do exaggerate their accounts of this (real) pain.* Here, the ALJ was *well aware* that Carradine suffered from a degree of pain and physical ailments, and expressly recognized that *Carradine's profile* revealed "*a tendency to develop chronic physical ailments, usually resulting from psychological stress and conflicts.*" R. at 24-25 (emphasis added). Thus, the ALJ was well aware and cognizant of the fact that Carradine experienced some pain, the origin of which was psychological.

But the *mere fact that Carradine experienced some pain stemming from psychological stress and conflict is not enough to entitle her to social security benefits—indeed, it is required that*

---

(...continued)
where "the ALJ state[s] that he f[inds the claimant's] testimony incredible and explain[s] why[,] . . . [the court] will not reverse the ALJ 'simply because some evidence may support the opposite conclusion.' " *Id.*

Here, there was a plethora of evidence to support the ALJ's determination that Carradine was not credible in her allegation of disabling pain (namely: (1) the inconsistency of her physical activities with her concomitant claims of 24-hour-a-day severe pain; (2) her demonstrated tendency to exaggerate her impairment, as she had done during a prior physical strength test; (3) her somatization disorder, which suggested a tendency to exaggerate her pain complaints; and (4) a lack of objective medical evidence). Because substantial evidence supports the ALJ's determination that Carradine was incredible, just as the court did in *Metz*, this Court should defer to the well-founded credibility determination of the ALJ.

*she establish that her pain is so severe that she is incapable of working as a result of such discomfort.* And in this case, although Carradine *claimed* she was disabled on account of her pain, the ALJ *did not agree and made an express finding that Carradine's account of the nature and extent of her pain was not credible insofar as she exhibited a tendency "to exaggerate her account of [her physical] limitations."* R. at 19 (emphasis added). Because it is accepted medical knowledge that *those suffering from somatic disorders **do** tend to magnify complaints of pain, see supra, it was certainly proper for the ALJ to consider this factor in making his credibility determination.*

Beyond recognizing that Carradine's somatization disorder suggested a tendency to exaggerate symptoms, the ALJ further attributed his assessment of *Carradine's lack of credibility to the fact that Carradine's claim of severe, unremitting pain was, among other things, inconsistent with her own account of her daily activities*. The record is most eloquent in its clear recitation that Carradine engaged in a variety of activities, both daily and weekly, including: daily walks for exercise of up to two miles a day;[19] attending church and

---

[19] As for Carradine's ability to walk two miles on occasion, the majority apparently believes it was "perverse" for the ALJ to rely on this fact to support his denial of benefits. But the fact that Carradine *is* able to walk two miles means she must be in good shape, and it *certainly* supports the ALJ's determination that Carradine was "inconsisten[t] in her account of the severity of her pain," for, despite her allegation of disabling, "24 hour a day" back and head pain, Carradine freely admitted she was able to walk an "average" of one to two miles. R. at 65-66.

In a real stretch, the majority somehow implies that the ALJ placed improper emphasis on Carradine's walking activities as evidence she was exaggerating her pain complaints because, if Carradine were to return to work she would somehow lose the

(continued...)

social meetings; gardening; doing housework such as cooking, cleaning, and some laundry; driving her car to run errands a couple times a week; and driving a car long distances (as far as seventy-five miles round-trip to and from school, a couple days each week, with occasional stops for lower back discomfort). As the ALJ properly concluded, Carradine's ability to frequently engage in and complete these and other physical activities *contradicted her repeated testimony regarding the severity and constancy of her pain, thereby undermining her credibility. See Amax Coal Co. v. Burns*, 855 F.2d 499, 501 (7th Cir. 1988) ("*Drawing inferences from the evidence is part of the ALJ's role as factfinder.*") (emphasis added); 20 C.F.R. § 404.1529(c)(3)(I) (stating that the SSA will consider a claimant's daily activities as a factor relevant to assessing pain symptoms); Social Security Ruling 96-7p (explaining that an adjudicator evaluating the credibility of a claimant's statements should consider the "*consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities*") (emphasis added).

_____

(...continued)

opportunity to exercise. *See* Opinion, at 7 (noting that walking is "not only . . . a form of therapy, but it is not a form of therapy available at work."). Does the majority really believe that all persons who engage in full-time sedentary work are foreclosed from any opportunities to talk a daily walk? I suspect that many people who have sedentary jobs nonetheless *have ample opportunity to reap the benefits of significant walking exercise*—by walking to and from the bus, or to and from a restaurant or cafeteria on the lunch hour, etc. It is beyond the pale to imply that the ALJ was inadvertently or imprudently foreclosing Carradine from pursuing prescribed physical fitness outlets by concluding she was capable of work.

   While the majority somehow is able to arrive at a conclu-
sion that her admitted daily activities were consistent with
her accounts of pain, I am forced to disagree, for this is not
borne out in the record. According to the majority,
Carradine "*d[id] not claim to be in wracking pain every minute
of the day*," and thus (the majority opines) it is feasible that
"*[w]hen she feels better for a little while, she can drive, shop, or do
housework.*" To the contrary, the record reveals that
Carradine *did claim to be in constant and frequently severe pain,
as the following colloquy between her and the ALJ demonstrates*:

> ALJ: Let's *talk about your pain*, where's it *located and how
> often you get the pain*. I'm going to be asking you *how
> intense the pain is on a scale of zero to ten*, zero being the
> least amount of pain you've had and ten you have to go
> to an emergency room. Okay. Let's talk about your
> headaches. . . . *How often do you get this headache*?
>
> CARRADINE: *They're never gone completely.*
>
> ALJ: So, *it's 24 hours every day*?
>
> CARRADINE: *Yes . . . I don't remember not having [head-
> aches].*
>
> ALJ: What's the *intensity of these headaches*?
>
> CARRADINE: *It can range maybe a three or four **up to a
> ten** because I've had to go to the emergency room.*
>
> . . .
>
> ALJ: And *how often do you get . . . backaches*?
>
> CARRADINE: *[I]t's never not there.*
>
> ALJ: ***24 hours a day, every day?***
>
> CARRADINE: ***Yes, ma'am.***
>
> ALJ: What's the *intensity of the backaches on the zero to ten
> scale*?

> CARRADINE: . . . *it's usually around a **seven** maybe*.
>
> ALJ: And what relieves that?
>
> CARRADINE: I'm *not sure anything relieves it*. . . .
>
> ALJ: *You don't take any medication for it*?
>
> CARRADINE: *Yes, I do*.
>
> ALJ: And the *medication doesn't help?*
>
> CARRADINE: *No.*

R. at 63-65 (emphasis added). Thus, in her testimony, Carradine claimed to be in, or close to, "*wracking pain every minute of the day.*" Certainly, Carradine's claim to suffer from *"level 7" backaches* and *"level 4-10" headaches **24 hours a day, 7 days a week, and 365 days a year*** was inconsistent with her continued *engagement in a variety of almost daily physical activities, such as walking for long distances and driving a vehicle (sometimes for great distances)*. Thus, *the ALJ*, after having had an opportunity to see, hear, and evaluate the claimant's testimony, was *well within the bounds of reason and his discretion when he determined that Carradine's credibility was undermined by the inconsistency between these unqualified claims of constant and severe pain and the daily activities that she admitted performing.*[20] *See* R. at 17 ("*The claimant's testimony*

---

[20] Furthermore, I must note that, after stating that "Carradine does not claim to be in wracking pain every minute of the day," the majority proceeds to consider the question of whether Carradine's daily activities support the ALJ's ultimate Residual Functional Capacity ("RFC") finding. But this discussion of Carradine's RFC is inapposite to the issue we are considering here—namely, whether the ALJ's reasoning regarding his *determination of Carradine's incredibility* is supported by Carradine's admissions regarding her physical activities (walking, driving,

(continued...)

*and her discussions of her impairment are not reliable[,] [for i]n the course of her testimony, her account of limitations was inconsistent.*"). Clearly, the *majority is substituting its own judgment over that of the ALJ when it completely fails to recognize the propriety of the ALJ's conclusions in this regard.*[21]

_____

(...continued)
self-care, shopping, mopping, gardening). After all, the ALJ reasoned in his decision that Carradine's admission that she engaged in these activities contradicted her *claims regarding the extent of her unremitting (24-hour-a-day), severe pain*, thereby destroying her credibility. This was an entirely proper credibility determination, for all of these activities require a significant amount of physical stamina and agility that is inconsistent with her claims of disabling pain. (Gardening, in particular, requires one to position her knees on the ground, and to bend and stoop and balance her body in order to pick and cut flowers, till soil or plant seeds. Carradine's admission that she engaged in gardening activities—among other various activities—thus belied her claim to be in unremitting severe pain.)

Indeed, *it was Carradine's ability to regularly engage in all of these physical activities, combined with the fact that there was not one iota of credible evidence that she suffered from disabling pain, as well as the record evidence that Carradine had in the past exhibited "minimal efforts" during a strength test evaluation, which together led to the ALJ's ultimate conclusion that Carradine's complaints of disabling pain were less than credible.*

[21] I would also note that Carradine's treating physicians similarly believed that (despite her complaints of pain) Carradine was capable of doing significant physical activity. Time and time again, the medical record reveals not only that her treating physicians prescribed relatively mild and over-the-counter medical treatments for Carradine's accounts of pain (because they found no physical source for such pain), they *further recommended **daily physical exercise** as a treatment method for Carradine's pain*

(continued...)

For further support of his determination that Carradine's pain complaints were unreliable, the *ALJ properly referenced the patient's medical records, which exhibited an utter lack of any substantive medical findings supporting a serious disability* (and are thus consistent with his conclusion that *Carradine's disabling pain complaints were overblown*). *See* 20 C.F.R. § 404.1529(c)(4) (explaining that the SSA "will evaluate [a claimant's] statements [about the intensity, persistence, and limiting effects of her symptoms] in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [she is] disabled"); Social Security Ruling 96-7p ("*In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record*.") (emphasis added).

The majority glosses over and casts aside the claimant's history of relatively benign and sporadic periods of treatment,[22] and would completely ignore this history's impor

---

(...continued)

*allegations*. If doctors repeatedly prescribed regular exercise programs for Carradine (for example, Dr. Goodloe recommended that Carradine "perform water aerobics *three times per week*," R. at 415, as well as "daily" walks, *id.* at 417, and Dr. Macadeag suggested Carradine should "maintain[] a *structured and consistent exercise therapy program*," R. at 537), they must have believed these physical fitness and exercise routines would be beneficial to her, and within her limitations—her pain complaints notwithstanding.

[22] The majority states that Carradine underwent "heavy doses" of

(continued...)

tant role in undermining Carradine's testimony regarding

---

(...continued)
"strong drugs such as Vicodin, Toradol, Demerol, and even morphine," but as to this contention I must note that the record speaks otherwise, for she was administered Demerol and morphine *on only one occasion each*—that is, during separate emergency room visits in July (for the Demerol) and October (for the morphine) of 1999 when she presented with *subjective complaints of pain.* R. at 521, 525. Moreover, the record reports that these medications were not continued by Carradine's successor treating physicians.

As for the Vicodin, the fact that a person with somatoform disorder was treated with pain medication is not surprising given that doctors (as the ALJ ably explained was the case here) *often* take such patients' complaints of pain at face value and, seeking to treat those pain complaints, offer pain medications as a method of alleviating the purported pain. Indeed, even though the usual medical doctor's studies and lectures include a limited amount of study of psychiatry (as contrasted with a psychiatric specialist, who goes on to three or four years of study focusing on psychiatry), a medical doctor's primary duty is to treat the *physical* complaints presented to him by the patient.

Here, the fact that Carradine's medical doctors treated her subjective complaints of pain with pain medications does *not* mean that her accounts of severe and disabling pain were accurate. It simply means that the medical doctors, accepting those subjective complaints at face value, were willing to try various pain killers (at times, no more than simple non-prescription, over-the-counter remedies) as a means of treating her purported symptoms. *Cf. Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001) (deferring to the ALJ's conclusion that the somatic claimant's subjective complaints about her physical limitations were not credible, and denying benefits to the claimant—notwithstanding the fact that the claimant had, *inter alia*, been prescribed Vicodin as a treatment for her pain complaints).

her level of severe and overpowering pain. But under the law, Carradine's medical record (*reflecting a lack of any medical evidence of disability therein*) does in fact assist in establishing the "substantial evidence" required to support the ALJ's conclusion that her complaints of pain were exaggerated. As this Court stated in *Powers*, "[w]hile a[n ALJ] may not reject subjective complaints of pain *solely* because they are not fully supported by medical testimony, *the [ALJ] may consider [a lack of objective evidence of any medical condition] as probative of the claimant's credibility*," for "*[t]he discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence **is probative that the witness may be exaggerating her complaints**.*" *Powers*, 207 F.3d at 435-36 (emphasis added). And while it is true that "[p]hysical examination [of individuals with somatization] is remarkable for the absence of objective findings to fully explain the[ir] many subjective complaints," *DSM-IV* at 447,[23] it is not unreasonable to expect that symptoms of pain and discomfort manifested by one suffering from somatization disorder would be evidenced in *some* observable and medically acceptable manner (for example, by inordinate restrictions on movement).[24] This result would

---

[23] According to Social Security Administration regulations, somatoform disorder is characterized by "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.07. In addition, however, an individual suffering from the disorder may have an "[u]nrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury[.]" *Id.*

[24] It should also be noted that, at each of her hearings before different ALJs in this matter, the *only persons testifying regarding Carradine's severity of pain were the claimant herself and her husband.*

(continued...)

seem especially likely when the claimant characterizes and exaggerates that the pain is ever-present and severe ("24 hours a day, every day . . . . [nothing] relieves it . . . ."), as does Carradine. Indeed, other courts have cited a lack of objective medical evidence of severe pain as a proper grounds of support for an ALJ's determination that a somatic patient's complaints of pain are not entirely credible. *See, e.g.*, *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995) (noting that "the absence of objective medical evidence of severe pain," as well as other factors, "support[ed] the ALJ's decision to discredit Metz's subjective complaints of pain.").

The final evidence cited by the ALJ to support his finding that Carradine's pain complaints were incredible was that "[d]uring a functional capacity evaluation by a competent therapist, [Carradine] responded with invalid efforts." R. at 17. According to the physical therapist who evaluated her on April 13, 1999:

> [I]n looking at the 30 validity criteria, [Carradine] did not satisfy validity criteria on 20 out of 30 tasks . . . *[but a number of] [t]hese invalid criteria were due to minimal efforts being recorded.* Patient's subjective complaints are compatible with this, however the physiological responses recorded during [other testing] do not support the results obtained in the testing.

R. at 483. *The fact that Carradine had exaggerated her physical limitations as recently as 1999 (i.e., by giving minimal effort during physical testing), combined with the lack of medical evidence and the inconsistencies between her accounts of the*

---

(...continued)

*Not one independent witness—such as a former employer or, even better, a medical doctor, physical therapist, psychologist, or expert on pain—corroborated any part of her account of her disabling pain under examination at these hearings.*

*severity and duration of her pain and her stated daily activities, lent ample support to the ALJ's conclusion that Carradine was not credible in her account of disabling pain.*

Despite the substantial record evidence supporting the ALJ's assessment of Carradine's credibility, the majority misguidedly attempts to assail his credibility determination, substituting its own findings for that of the trier of fact, and ultimately engaging in its own unsupported credibility assessment by speculating over a series of seemingly preconceived "improbabilities."[25] Yet for all of the

---

[25] Regarding its perceived "improbabilities," the majority essentially argues that Carradine's repeated medical visits and oft time very minimal treatment with conservative (mild) medications over roughly seven years should be viewed as supporting the credibility of her complaints of pain. Opinion, at 5-6 (explaining the "improbability" that Carradine would have sought this medical treatment if she had not been in pain). But the fact that Carradine has continued to go from doctor to doctor to doctor with her various (unsubstantiated) complaints of alleged pain—in spite of each doctor's repeated failure to discover an objective physical explanation for such pain—says more about her willingness to outlast the system than it does her credibility as a disability claimant.

Moreover, with these comments, it appears the majority is engaging in its own misapplication of somatization. The point is not that Carradine necessarily malingered as part of some conscious plan to receive benefits; rather, it is that *her condition frequently produces a disconnect between the severity of pain that she reports and the actual severity of her pain.* At its outer limit, the majority's reasoning (i.e., *that frequent visits to medical personnel by someone seeking treatment evinces genuine pain) would greatly aid all hypochondriacs who seek the receipt of government benefits.* In any event, the

(continued...)

(...continued)

majority's interpretation ignores the fact that a large majority of Carradine's treatment involved conservative approaches, consisting of self-administered medication (pain medications, as well as non-prescription, "over-the-counter" anti-inflammatories) and physical therapy. Likewise, it is equally plausible that Carradine was simply a "doctor shopper" (and will in all probability continue to "doctor shop") in hopes of accomplishing her ultimate goal of collecting disability payments at the government's expense (while not working).

Next, the majority comments on the improbability that she could "fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain." But according to the record, the accounts of medical personnel concluding that she *actually was suffering "severe" pain are, at best, very few and far between.* It is noteworthy to observe that statements by medical staff noting high levels of pain are generally limited to those based on what Carradine expressed to them. Moreover, the ALJ considered the very issue raised by the majority when he observed that, from the record, it appeared "the doctors accepted the claimant's complaints at face value" and recorded the same (which would explain why they proceeded to treat her in the absence of any objective medical evidence of ailment). R. at 19. Indeed, as this Court recently emphasized in *Barrett v. Barnhart*, 335 F.3d 1065 (7th Cir. 2004), the ALJ must give weight to medical decisions that are based upon *objective physical and scientific tests and evaluations* —not in those cases where, as here, the doctor's report or treatment is merely based upon a claimant's subjective complaints:

> "[T]o give no weight at all to [a treating physician's] report because [a complainant] had exaggerated her condition to [the physician] (and we accept the administrative law judge's finding on that score, a well-nigh unreviewable
>
> (continued...)

majority's efforts to dislodge the ALJ's credibility determination, it remains evident from the medical evidence, Carradine's own account of her extensive physical activities, and her history of giving "minimal efforts" on physical exams (as set forth in the record), that the record in this case provides *more than ample support* for the ALJ's determination that Carradine's accounts of pain were unreliable, and, moreover, that the ALJ's credibility determination was "not patently wrong." *See Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (noting that "[s]ince the ALJ is in the best position

---

(...continued)
determination of credibility) was arbitrary, ***since the [physician] based her evaluation on physical tests and observation, not just on what [the claimant] told her.*** *Id.* at 1067 (emphasis added).

On the other hand, as in this case, *where a medical expert's report is based solely on a complainant's own subjective accounts of pain*, that report *is not entitled to controlling weight. See Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999) (doctor's opinion not entitled to controlling weight where physician "did not obtain any evidence beyond . . . [patient's] subjective complaints . . .").

Finally, the majority talks of the "improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she was faking her symptoms." As I mentioned previously, *the medications and treatments provided to Carradine were predominantly conservative and mild, reflecting the fact that the medical professionals realized that only minor treatment was needed to alleviate her symptoms.* Moreover, the offering of this nature of care does little or nothing to support the alleged *severity* of her pain; doctors treat and prescribe medicine to alleviate discomfort from minor pains as well, even when such pains fail to rise to the level required to receive social security disability benefits.

to observe witnesses," this Court will "not upset credibility determinations on appeal so long as they find *__some support in the record__* **and are** *__not patently wrong.__*").

On the other hand, *__the record does not support__* the majority's unfounded assertion that the "[ALJ] failed to take seriously the possibility that the pain was indeed as severe as Carradine said but that its origin was psychological rather than physical," for in fact the record reflects a very extensive, well-reasoned decision by the ALJ. As I noted earlier, the ALJ, when taking into account Carradine's somatization disorder, fully recognized that the claimant had "*__a tendency to develop chronic physical ailments, usually resulting from psychological stress and conflicts.__*" R. at 24-25 (emphasis added). Yet, as I also explained heretofore, the ALJ at the same time reached the reasonable and well-supported conclusion (and made the same determination that the previous ALJ had also reached, in an earlier decision, *see infra* note 28) that Carradine's accounts of her pain were exaggerated. The ALJ's conclusion may be different than that which the majority might reach *if* it were the trier of fact, but according to accepted law, *__this Court is not free to substitute its own judgment. Furthermore, our role "is not to reweigh any conflicting evidence; so long as reasonable minds may differ, the [ALJ's] decision will be upheld."__* *Lee*, 988 F.2d at 793-94 (emphasis added).[26]   Only by stripping the

---

[26] Lest a reader of the majority opinion be confused, Carradine's case can readily be distinguished from *Vertigan v. Halter*, 260 F.3d 1044 (9th Cir. 2001), and *Cox v. Apfel*, 160 F.3d 1203 (8th Cir. 1998), which are cited by the majority, purportedly to support the decision to overturn the sound credibility determination of the ALJ. Even if we assume that the Ninth Circuit's reasoning in *Vertigan* is consonant with principles of social security benefits

(continued...)

(...continued)
law and the role of courts when reviewing decisions of SSA administrative law judges, in Carradine's case the evidence is overwhelming that there is much more than a mere "scintilla of evidence in the record to support the ALJ's finding that she lacked credibility about her pain and physical limitations." Opinion, at 7-8 (quoting *Vertigan*, 260 F.3d at 1050). In contrast to *Vertigan*, the ALJ's credibility finding in *this* case was supported by: (1) the lack of objective medical evidence in the record to support Carradine's claims of pain; (2) the inconsistency of Carradine's physical activities with her claims of pain; (3) the fact that Carradine had, in the past, exhibited "minimal efforts" during evaluation of her physical capabilities; and (4) the fact that Carradine's somatization disorder inclined her to exaggerate her accounts of pain. These four factors can hardly be characterized as a mere "scintilla" of support in the record, and, on the contrary, *represent substantial record support for the ALJ's finding that Carradine was not credible in claiming that her pain was disabling.* Moreover, unlike the plaintiff in *Vertigan*, Carradine's pain complaints have been met with relatively *conservative* medical treatment, while Vertigan had a total of *six spinal surgeries* to treat her chronic back ailment. For all of these reasons, *Vertigan* presented a fact pattern that is not at all analogous to the instant case.

The majority's citation to *Cox* is even more troubling. The majority quotes the following language from *Cox*, erroneously finding it informative to Carradine's case: "We [the court in *Cox*] question whether a claimant with seven years of medical records detailing repeated complaints of severe pain, who undergoes three back surgeries in the hopes of alleviating that pain, and who now lives with a morphine pump implanted in her body, can be found not credible regarding her complaints of pain." *Cox*, 160 F.3d at 1207. By contrast to the complainant in *Cox*, Carradine only *temporarily* had a spinal cord stimulator installed. Moreover, such a procedure is considered to be *minimally invasive* as

(continued...)

ALJ of his due deference—and in the process impugning his reasoning—could the majority obtain the result that it does.

### III. *Conclusion*

The ultimate task facing the ALJ in this case was to determine whether Carradine's narration of her unremitting ("24 hours a day," "level seven"), debilitating pain—which was not corroborated in her extensive medical history— was credible to support an awarding of SSA disability benefits. The ALJ, the trier of fact, answered this inquiry in the *negative and highlighted substantial evidence in the record in support of his credibility determination—including Carradine's somatization disorder (tendency to exaggerate symptoms), the extent of her daily activities (and their inconsistency with her accounts of unremitting, "24 hours a day," severe pain), the lack of objective medical evidence of ailment (including the testimony set forth by a myriad of the medical personnel involved in her medical history), and evidence that she had exaggerated her physical limitations in a prior physical fitness test by giving "minimal efforts."*

---

(...continued)
compared to *even a single back surgery*—whether it be a laminectomy or a spinal fusion or the repair of a herniated disc—much less *three major back surgeries and implantation of an intrathecal morphine pump as occurred in Cox. Id.* at 1208. In fact, most of the medical professionals treating Carradine found such an invasive course of treatment unnecessary and entirely uncalled for. For example, Dr. Macadaeg, an anesthesiologist/pain disorder specialist who examined Carradine in 2000 and also diagnosed her with somatization disorder, *specifically recommended against any further interventional therapy, said that she would continue to improve, and determined that "[s]he is certainly not surgical in nature."* R. at 534 (emphasis added).

Indeed, a brief review of the record reveals that the factors considered by the ALJ, as well as his reasoning, were supported by substantial evidence:

(1)  In February of 1993, Carradine suffered a slip-and-fall accident, and shortly thereafter began receiving workers' compensation benefits for ensuing back pain.

(2)  *As of June 8, 1993, these workers' compensation benefits were terminated*, based on a determination, made pursuant to the "medical evidence[,] [that] treatment [for Carradine's back pain] *[wa]s no[] [longer] related to [her] fall at work.*" R. at 160 (emphasis added).

(3)  In August of 1993, Carradine returned to her job as an addiction counseling aide, but *was ultimately discharged from that position in February of 1994, for "failing to follow procedures"*; Carradine explained that she wasn't fired for not being able to lift or anything, but rather because *she "had missed work."* R. at 47 (emphasis added).

(4)  From February of 1993 (her accident), over a *period of more than seven years*, Carradine visited some *thirteen* doctors and physical therapists to treat her alleged recurring back and spinal pain; but time and again, *medical tests (MRIs and x-rays of her back) revealed no abnormal findings (only mild to moderate degeneration/mild narrowing of the spine and no disc herniation)*. R. at 208, 293-94.

(5)  During a functional capacity evaluation before a physical therapist, conducted in April of 1999, Carradine exerted only "*minimal efforts*" during testing—a finding supported by Carradine's physio-

logical responses during an isometric strength test, as well as her results on a hand dynanometer ("squeeze") test.

(6) Despite Carradine's decision to exert only "minimal efforts" during examination, the physical therapist administering the test was nonetheless able to conclude from a compilation of the various other tests administered that _Carradine was "capable of sedentary work."_ R. at 483.

(7) In June of 2000, a clinical psychologist evaluated Carradine and diagnosed her as having _somatization disorder;_ according to the DSM-IV, somatics tend to "_describe their complaints in . . . **exaggerated** terms . . .,_" DSM-IV at 446. Stated differently, somatics are "_prone either to **exaggerate the magnitude of their complaints** or to present these complaints in a **melo-dramatic fashion** . . . ." See_ Gerald M. Aronoff, "Evaluating and Rating Impairment Caused by Pain," _in Disability Evaluation_ 552, 553 (Stephen L. Demeter & Gunnar B.J. Anderson eds., 2d ed. 2003) (emphasis added).

(8) At her administrative hearings, Carradine claimed to be in _constant_ pain, stating that both her headaches and her backaches are there "24 hours a day, every day . . .," R. at 63-65, and further alleged that these backaches and headaches were consistently severe. _Id._ (back pain usually around a level "seven," headaches constantly in the "three or four to a ten" range).

(9) Her claims of _constant, severe pain_ notwithstanding, Carradine _admitted to performing the following physical activities_:

   (i)      _daily walks for exercise of up to two miles a day;_

   (ii)    *attending church and social meetings*;

   (iii)   *gardening* (which involves stooping, bending, and balancing while tilling soil and planting seeds or pulling weeds);

   (iv)   *doing housework such as cooking, cleaning, and some laundry*;

   (v)   *driving her car to run errands* a couple times a week, as well as driving long distances (as far as seventy-five miles round-trip to and from school), a couple days a week, with occasional stops.

Based on the foregoing evidence, the ALJ properly concluded that Carradine's claim of constant, *severe and constant pain* was "not entirely credible," and thus reached the reasonable and well-supported determination to discount her allegation of disabling pain. This record evidence also supported the ALJ's RFC[27] finding that Carradine can "perform a limited range of light work," such as continuously standing or walking for up to an hour, occasionally climbing stairs or a ladder, occasionally pushing or pulling up to ten pounds, frequently lifting ten pounds, and occasionally lifting or carrying up to twenty pounds. *Cf.*

---

[27] RFC is defined as "an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1545(a)(1) (defining RFC as what "you can still do despite your limitations"); Social Security Ruling 96-8p (defining RFC as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. . . . [It] is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*.").

*Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994) ("[Defendant's] statements of his own activities further support the ALJ's finding that he was capable of performing a full range of sedentary work.").

We must not forget that according to Carradine's own testimony, she was discharged from her job for failing to follow procedures (as she explains, she had "missed work")—which obviously does not relate to an inability to perform physical work due to pain. *See supra* note 5. More fundamentally, I must disagree with the majority's fallacious reasoning and unsupported conclusion in rejecting the ALJ's credibility determination; although their argument is certainly creative, it is not borne out in the record. I thus fail to ascertain any alleged "errors in reasoning" to support my fellow panel members' qualms about affirming the ALJ's decision.

It would be nigh unto impossible for me to justify a claim barren of any support in the medical evidence inscribed in the record. Therefore, I can see no reason to accept the majority's decision to overturn the ALJ's detailed findings of fact and sound application of the law (particularly considering ALJ Bernstein was but one of a total of *five* different administrative and judicial entities to refuse to award Carradine disability benefits over the course of these proceedings[28]). While the majority refrains from expressly

---

[28] Throughout the course of pursuing her claim, there have been **six different occasions** *where separate and distinct governmental hearing agencies or tribunals set out to determine whether Carradine is due benefits, as well as a federal district court, have refused to award Carradine disability benefits based on a lack of any supporting medical evidence in the record* (the SSA—which denied her claim both initially and on reconsideration, two ALJs, the Appeals Coun-
(continued...)

going that far, it is also unfathomable to somehow come up with nonexistent "flaws in logic" and remand this matter to give the claimant an *eighth* kick at the cat.

The ALJ found that Carradine's daily activities, her testimony, and the available physical and psychological medical findings did not support her allegations of suffering from debilitating pain, and that her pain complaints (and

---

(...continued)

cil—which denied review of ALJ Bernstein's denial of benefits, as well as the district judge). *Indeed, there has been only one instance*—when, after considering the first ALJ's decision denying benefits, the Appeals Council determined to remand the cause to the ALJ to consider additional evidence that had been included in the record—in which Carradine's claim for benefits was *not* denied by the decision maker.

In 1994, the SSA denied Carradine's claim initially and again upon reconsideration. On appeal, her claim was again denied by ALJ Kathleen Donahue in a decision and order dated September 11, 1996, which had followed a April 24, 1995, hearing. Of note, *ALJ Donahue also made a finding as to the petitioner's lack of credibility, stating that she did not "find the claimant to be totally credible."* R. at 322. On July 13, 1998, the Appeals Council vacated ALJ Donahue's decision and remanded the matter in order for the ALJ to consider post-hearing evidence and some additional medical evidence. Upon remand, a hearing was held before ALJ Bryan Bernstein, after which he once again issued a decision denying Carradine's claim. ALJ Bernstein also *made a finding that her statements about her impairment were "not entirely reliable."* R. at 27 (emphasis added). After the Appeals Council denied review of Judge Bernstein's decision, the district court below concluded that ALJ's denial of benefits was a valid decision. While it is only ALJ Bernstein's decision that forms the basis for the current appeal, it is worth asking: How many ALJs who had person-to-person contact with Carradine—and who did not believe her—do there need to be before we can put this case to rest?

the extent thereof) were therefore unreliable. In my opinion, this credibility determination was well-reasoned, and supported by substantial evidence in the record, and certainly not "patently wrong" as the majority somehow incorrectly concludes.[29] I concur with the *five other* governmental entities that have concluded on *six separate occasions* (the SSA, in its initial decision as well as upon reconsideration, two ALJs, the Appeals Council, and the federal district court) that *Carradine is not disabled from work*, and affirm the district court's judgment upholding the ALJ's well-documented decision to deny the claimant disability insurance benefits.

A true Copy:

      Teste:

 

                     _____

                     *Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[29] And, as I pointed out earlier, let us not forget the economic effects of what a decision of this nature (*i.e.*, a decision refusing to apply the great level of deference we owe to the fact-finder) would do to the ever-depleting social security benefits program and the insurance industry as a whole.