**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 11-2107

WILLIAM E. ORMON,

Plaintiff, Appellant,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before
Torruella, Boudin and Lipez,
Circuit Judges.

Ronald B. Eskin on brief for appellant.
Anita Johnson, Assistant U.S. Attorney, and Carmen M. Ortiz,
United States Attorney, on brief for appellee.

September 7, 2012

**Per Curiam**.  Claimant William E. Ormon appeals from the denial of Social Security disability benefits and raises two issues:  (1) whether the administrative law judge (ALJ) had reopened the time period covered by claimant's first application for benefits; and (2) whether substantial evidence supports the ALJ's determination that because claimant could perform his past work, he was not disabled.  As for the first issue, we agree with the district court, essentially for the reasons given by that court, that claimant's first application had not been reopened. Ormon v. Astrue, 793 F. Supp. 2d 465, 471-72 (D. Mass. 2011).  The relevant time period under consideration, then, runs from February 8, 2006, the day after the denial of the first application, to September 30, 2008, the date claimant's insured status expired. Whether claimant was disabled during this period, however, is complicated, and we think that a remand is required.

## I.  Background

Claimant was in an automobile accident in January 2004, and eventually a spinal MRI showed the displacement of the S1 nerve root as the result of a moderate to large disc extrusion at the L5-S1 vertebrae.  Transcript, at 345-46.  Although claimant underwent spinal fusion in September 2005, his back pain continued.  In particular, Dr. Bruce Cook, claimant's surgeon, noted in January 2006 that claimant's ability to bend forward was limited to 60 or 70 degrees.  Id. at 372.  Then, when a June 2006 MRI revealed no

-2-

evidence of a residual or recurrent disc herniation, Dr. Cook referred claimant to a pain medicine specialist for a facet block injection.  Id. at 364, 369.

This physician, Dr. Gopala Dwarakanath, examined claimant in July 2006 and reported that claimant could walk the length of a corridor "briskly without any difficulty" and that straight leg raising was negative; however, it was observed that extension was positive bilaterally and that there was positive "facet loading" at L4-L5 and L5-S1 (the term "facet loading" was not explained).  Id. at 367-68.  Dr. Dwarakanath's impression was that claimant's symptoms likely were arising from the facets, rather than from the joints, and he scheduled a facet block injection.  Id.  Claimant then sought a second opinion from Dr. Eugenio Martinez, a physician at New England Baptist Hospital.

Dr. Martinez, who also saw claimant in July 2006, reported marked straightening of the normal lumbar lordosis of claimant's spine and noted that the range of motion of claimant's spine was limited in all directions – i.e., forward flexion was 75 degrees, extension was 15 degrees, bilateral side flexion was 15 degrees, and bilateral straight leg raising was limited to 75 degrees.[1]  Id. at 676.  Nonetheless, claimant's muscle strength was 5/5, and there was no obvious atrophy.  Id.  Dr. Martinez then

---

[1]Flexion is the forward bending of the spine, and extension is the straightening of the spine.  2 J. E. Schmidt, M.D., Attorneys' Dictionary of Medicine, at F-113, E-251 (2011).

-3-

explained that "it can be difficult if not impossible to determine the specific cause of pain in these situations" and noted, without explanation, that "[t]he presence of medical-legal involvement, as well as current, pending application for Social Security Disability could be considered negative prognostic indicators, according to the literature." Id. at 677. Dr. Martinez recommended aggressive physical therapy. Id.

Claimant eventually began treatment with Dr. Edgar Ross at the Pain Management Center at Brigham & Women's Hospital. On claimant's initial exam, which occurred in early August 2006, Claimant's neurological functioning was intact to sensation, overall strength was 4/5 or 5/5, and straight leg raising was negative. Id. at 527, 529. However, claimant's range of motion in his lumbar spine was limited in all directions – i.e., 70 degrees flexion, 10 degrees extension, and 20 degrees side to side flexion bilaterally. Id. at 529. A bone scan performed in late August was normal. Id. at 525.

In October 2006, claimant consulted with Dr. Troy Schmidt, an orthopedic surgeon at Brigham & Women's Hospital. At this time, as at others, claimant's motor strength was 5/5, and sitting straight leg raising was negative. Id. at 578. Flat straight leg raising, however, was positive bilaterally, with elevation limited to 30 degrees; again, claimant's range of motion in his spine also was limited – i.e., claimant could forward flex

only to the point where his fingers came to the level of his knees, he could not extend at all, and sideways bending was limited to 10 degrees bilaterally. Id. Dr. Schmidt also noted, without explanation, that claimant had a "positive Waddell sign including cervical compression, which seems to exacerbate his low back symptoms." Id. Dr. Schmidt diagnosed painful spine, status post lumbar spine fusion, and opined that claimant might benefit from "revision fusion to his lumbar back given his radiographic findings of a possible lucency around the screws"; such lucency, according to Dr. Schmidt, was suspicious for a possibly incomplete fusion. Id.

The rest of claimant's treatment can be described briefly. Upon the recommendation of Dr. Ross, claimant received three lumbar facet joint injections in 2006, two in 2007, and two in 2008. Id. at 580, 630, 643, 627, 706, 745, 741. During this time, claimant considered having either a revision of the spinal fusion or the removal of the hardware in his spine, but there is no record of such procedures having occurred. Id. at 633, 698, 715. Last, an MRI of claimant's spine in December 2008 showed the development of a central shallow protrusion at L4-L5, and, in February 2009, EMG testing essentially was normal. Id. at 729, 734-35.

Dr. Ross also completed two RFC assessments. In August 2006, he opined that claimant was disabled due to low back pain and

that this condition was chronic with no improvement expected. Id. at 608. As for claimant's physical abilities, Dr. Ross reported that claimant (1) could stand and walk for a maximum of one hour each, (2) could sit for 30 to 60 minutes at a time, (3) could not lift or carry more than 10 pounds, and (4) could not stoop or bend. Id. at 611. Last, in April 2009 (about seven months after the expiration of claimant's insured status), Dr. Ross stated that claimant could sit for only one hour, could not lift more than five pounds, and was unable to bend or stoop; as a result, Dr. Ross concluded, claimant was "functionally and completely disabled." Id. at 753.

A nonexamining physician, Dr. M. A. Gopal, completed an RFC assessment in March 2007. Id. at 616-23. In this report, Dr. Gopal opined that, in an eight-hour workday, claimant was capable of sitting for six hours at a time, standing and/or walking for six hours, and frequently lifting and/or carrying 10 pounds. Id. at 617. Claimant also was rated as being able to occasionally stoop, kneel, crouch, and crawl. Id. at 618.

## II. Discussion

The ALJ concluded, based on Dr. Gopal's RFC assessment, that claimant was capable of engaging in light work and thus could perform his prior job as a cashier. Id. at 58-59. In so concluding, the ALJ also rejected the opinions of Dr. Ross and

-6-

found claimant's complaints of disabling symptoms not credible. We find the ALJ's reasoning flawed in all three respects.

A. Dr. Gopal

As the Commissioner correctly points out, an ALJ may reach the conclusion that a claimant can perform a particular level of work, even though such conclusion is based solely on the opinion of a non-examining physician. See Berrios Lopez v. Secretary of Health and Human Services, 951 F.2d 427, 431 (1st Cir. 1991) (per curiam). Of course, such evidence must be "substantial," and, under the regulations, the weight given to a nonexamining opinion "will depend on the degree to which [it] provide[s] supporting explanations." 20 C.F.R. § 404.1527(d)(3). Here, the explanation given by Dr. Gopal is lacking.

In this respect, Dr. Gopal gave four reasons for his RFC assessment: (1) claimant had no sensory or motor deficits, (2) straight leg raising was positive bilaterally; (3) claimant had painful and decreased range of motion in his back; and (4) despite spinal fusion, claimant still had back pain. Transcript at 617. Dr. Gopal also opined that "[a]llegations are credible," and we assume that this refers to claimant's allegations. Id.

The difficulty is that only one of these observations can be said to provide an explanation for Dr. Gopal's RFC assessment -- i.e., that claimant had no sensory or motor problems -- and this conclusory statement, standing alone, is hardly sufficient. See

-7-

Berrios Lopez, 951 F.2d at 431 (where reports from nonexamining sources "contain little more than brief conclusory statements . . . [such reports] are entitled to relatively little weight").  The other three reasons, in contrast, represent deficits in claimant's functioning and, as such, simply say nothing about claimant's ability to perform the demands of light work.  Moreover, since Dr. Gopal apparently credited claimant's allegations of disabling pain, his conclusion that claimant nonetheless could work is internally inconsistent.

Given the foregoing, such assessment cannot provide substantial support for the ALJ's conclusion that claimant is capable of performing light work.  Moreover, since this is not a case involving a claimant with "relatively little physical impairment," the ALJ could not make an RFC assessment based on the bare medical record.  Manso-Pizarro v. Secretary of Health and Human Services, 76 F.3d 15, 17 (1st Cir. 1996) (per curiam).  Although a remand, on this ground alone, is required, we go on to discuss, so that matters will be clear on remand, the ALJ's treatment of Dr. Ross's opinion and of claimant's subjective complaints of disabling pain.

B. Dr. Ross

As explained in the relevant regulation, a treating source's opinion on the question of the severity of an impairment will be given controlling weight so long as it "is well-supported

-8-

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Here, the ALJ gave three reasons for rejecting Dr. Ross's RFC assessment: (1) Dr. Ross had not described any objective clinical signs to support his RFC assessment and instead had relied solely on claimant's subjective complaints; (2) Dr. Ross's opinions were inconsistent with the other significant evidence in the record -- i.e., (a) claimant had been consistently described as having normal motor strength and sensation, stable gait, no muscle atrophy, and negative straight leg raising, and (b) MRI and other tests showed no significant abnormalities; and (3) Dr. Ross had not accounted for what the ALJ believed was evidence that claimant was malingering. Transcript, at 61.

The first problem with the ALJ's decision is that, although he is correct that claimant consistently had been described as having normal strength and sensation, stable gait, and a lack of muscle atrophy, his straight leg raising was negative only half of the time. Moreover, Dr. Ross, like the other doctors who examined claimant, noted a limited range of motion in claimant's spine. Like gait and straight leg raising, which the ALJ plainly viewed as "objective" medical evidence, we assume that a limited range of motion also qualifies as such evidence.

Further, claimant's physicians had identified two possible physical causes for his pain: (1) problems with the facets in his lumbar spine; and/or (2) an incomplete spinal fusion. The second possible cause, in turn, was supported by "radiographic" findings. Finally, there is no evidence in the record indicating that either of these two possible causes have yet been ruled out. Thus, the record is not devoid of objective medical findings supporting Dr. Ross's RFC assessment nor did Dr. Ross rely solely on claimant's subjective complaints.

The second difficulty concerns the ALJ's determination that Dr. Ross's RFC assessment was inconsistent with the record evidence. In this respect, Dr. Ross plainly was aware of the evidence that allegedly is inconsistent with the limits he placed on claimant's functioning; after all, Dr. Ross himself had made some of the findings to which the ALJ cited – negative straight leg raising, normal strength, and intact neurological functioning – and the record shows that Dr. Ross had received the essentially normal test results cited by the ALJ. Given this, it is plain that, despite these findings and test results, Dr. Ross believed that claimant's back condition was real and placed real limitations on claimant's ability to function. As a result, we think that, in a case involving complex back pain, such inconsistencies, standing alone, are not a sufficient basis upon which to reject a treating physician's opinion. In any event, the primary evidence

inconsistent with Dr. Ross's RFC assessment is the assessment of Dr. Gopal, and, as explained supra, this opinion is not well-explained and thus cannot be said to constitute substantial inconsistent evidence.

Last, The ALJ's decision to reject Dr. Ross's opinion because he had neglected to address the evidence of malingering post-surgery is similarly flawed. As evidence that claimant was faking it, the ALJ relied on the comments made by Dr. Dwarakanath, Dr. Martinez, and Dr. Schmidt. Transcript, at 60-61. The difficulty is that none of these physicians ever indicated that they believed that claimant was malingering or exaggerating his pain.

As for Dr. Dwarakanath, he made no comment regarding his observation that claimant could walk briskly down a corridor, much less a suggestion that such an ability rendered claimant's complaints of pain less credible. Similarly, Dr. Martinez, in stating that the literature indicates that medical-legal involvement "could" be a negative prognostic indicator, did not specifically say that, in claimant's case, such involvement was such an indicator; rather, Dr. Martinez seemed to be making an observation about recovery in the general population and mentioning such a prognosis as a possibility to keep in mind in claimant's case. Moreover, that both doctors did not believe that claimant was faking his back pain is clear as Dr. Dwarakanath scheduled a

-11-

facet block injection, and Dr. Martinez recommended physical therapy.  See Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004) (observing that it was improbable that claimant's physicians would have prescribed drugs and other treatment for her if they had believed that she was faking her pain and noting that "[s]uch an inference would amount to an accusation that the medical workers who treated [the claimant] were behaving unprofessionally").

This leaves Dr. Schmidt's unexplained statement that his examination had revealed a "positive Waddell sign."  Waddell signs are behavioral responses to physical examination that indicate the presence of nonorganic – e.g., psychological, social or behavioral – involvement in lower back pain, and such signs "are not on their own a test of credibility or faking."  Chris J. Main & Gordon Waddell, Behavioral Responses to Examination:  A Reappraisal of the Interpretation of "Nonorganic Signs", 23 Spine 2367 (November 1998), reproduced in the Appendix, at 763-67.  As the authors of the above article explain, since Waddell signs occur in patients who also have clear organic findings, isolated signs should not be considered clinically significant.  Id. at 763.  Indeed, the authors specifically state that "[i]t is safer to assume that all patients complaining of back pain have a physical source of pain in their back[s]."  Id. (emphasis added).  Given the foregoing, then, and given that Dr. Schmidt did not offer any interpretation of the

Waddell sign that he had observed, we can see nothing to support a finding that he believed that claimant was malingering.

C.  Claimant's Subjective Complaints

The ALJ found that, although claimant's back condition could be expected to produce pain, the intensity, persistence, and limiting effects of the pain were not credible to the extent alleged.  Transcript, at 59.  As support for this finding, the ALJ relied on the same reasons that he had used in rejecting Dr. Ross's RFC assessment:  (1) the lack of objective medical findings to account for such pain; and (2) the evidence that claimant was malingering.  Id. at 59-60.  Neither of the reasons, however, provides a sufficient basis upon which to discredit claimant's complaints.

As just discussed, no doctor determined that claimant was malingering, and the ALJ, as a lay person, was not qualified to make such a determination on his own in the circumstances of this case.  See Manso-Pizarro, 76 F.3d at 17.  Further, that claimant's pain may have a psychological component does not make the pain any less real.  "Medical science confirms that pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant."  Carradine, 360 F.3d at 753 (citations omitted).  Carradine is on point.

-13-

In that case, the claimant applied for disability benefits after injuring her back, and her diagnoses included degenerative disc disease, scoliosis, depression, and psychosomatic illness. The ALJ, as here, discredited the claimant's allegations concerning the severity of her pain on the ground, in part, that psychological testing had shown that she was exaggerating the pain. The Seventh Circuit held that the ALJ's reasoning in this regard was flawed.

First, the court explained that "[t]he question whether the [subjective] experience [of pain] is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second." Id. at 754. Second, the court emphasized that the claimant's extensive treatment history was inconsistent with a finding that she was exaggerating her pain:

> What is significant is the improbability that [the claimant] would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs . . . but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits; likewise the improbability that she is a good enough actress to fool a host of

> doctors . . . into thinking she
> suffers extreme pain.

Id. at 755 (citation omitted). Here, too, claimant sought treatment from many doctors, underwent back surgery and spinal injections, and was on pain drugs, some of which made him feel like a "zombie." Transcript, at 675. Similarly, and while not out of the question, we too think that it is improbable that claimant would have had an easy time fooling the various doctors who treated him, especially Dr. Ross, a pain medicine specialist.

Last, although the ALJ did not mention the extent of claimant's daily activities in discrediting his complaints of disabling pain, the Commissioner argues on appeal that these activities support the ALJ's decision in this regard. As the Commissioner notes, claimant reported, in June 2007, that he goes grocery shopping, does laundry and the dishes, and takes out light trash.[2] Id. at 200-07. However, claimant clarified that due to his back pain, he needs help bending when doing the laundry and the dishes, and he cannot handle heavy trash or yard work. Id. In any event, and as the court observed in Carradine, there is a "difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." 360 F.3d at 755.

---

[2]The Commissioner also relies on claimant's testimony at the hearing that he drives his daughter to and from school and that this takes a total of about four and a half hours per day. Id. at 24-27. It is clear, however, that such driving occurred in 2009, which is after clamant's insured status had expired. Id.

-15-

We therefore <u>vacate</u> the district court's judgment and direct that court to <u>remand</u> the matter for further proceedings consistent with this opinion.  No costs are awarded.